UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-61698-CIV-MARRA/JOHNSON

JEFFREY POOLE et al.,

Plaintiffs,

vs.

CITY OF PLANTATION, FLORIDA,
et al.,

Defendants.
_____/

## OPINION AND ORDER

This cause is before the Court upon Defendants City of Plantation and Robert S. Pudney's

Motion for Summary Judgment (DE 50); Defendant Joseph R. Harris' Motion to Adopt Co-

Defendants, City of Plantation and Robert S. Pudney's Motion for Summary Judgment (DE 141);

Defendant Joel Gordon's Motion for Summary Judgment (DE 142); Defendant Joseph R. Harris'

Supplemental Motion for Summary Judgment (DE 150); Plaintiffs' Motion to Strike Defendant

Harris' "Supplemental Motion for Summary Judgment and Incorporation Memorandum of Law"

(DE 156); Defendant Joel Gordon's Notice of Objection and/or Motion to Strike (DE 201);

Defendant Joseph R. Harris' Motion to Adopt Co-Defendants, City of Plantation and Robert S.

Pudney Corrected Concise Statement of Undisputed Material Facts in Support of Defendants'

Motion for Summary Judgment; Or, in the Alternative, Motion for Enlargement of Time to File a

Separate Concise Statement of Undisputed Facts in Support of Harris' Motion For Summary

Judgment (DE 228); Defendant Joseph R. Harris' Corrected Supplemental Motion for Summary

Judgment (DE 229); Defendants City of Plantation and Robert S. Pudney's Motion to Strike

Declaration of Thomas Tofexis (DE 232); Defendant Joseph R. Harris' Motion to Adopt Co-Defendants' City of Plantation and Robert S. Pudney, Motion to Strike Declaration of Thomas Tofexis (DE 234); Plaintiffs' Motion for Leave to Amend Complaint (DE 240) and Defendant Joseph R. Harris' Motion to Adopt Co-Defendants City of Plantation and Joel Gordon's Responses in Opposition to Plaintiffs' Motion for Leave to Amend Complaint (DE 243).   The Court has carefully considered the motions and is otherwise fully advised in the premises

**MOTIONS FOR SUMMARY JUDGMENT (DE 50, 141, 142)**

I. Background

The facts, as culled from affidavits, exhibits, depositions, answers, answers to interrogatories and reasonably inferred therefrom in the light most favorable for the plaintiffs, for the purpose of this motion, are as follows:

Plaintiffs, Jeffrey Poole, Jude Diaz, Sivy Del Rosario, Stephanie Kluver, Thomas Neri, Suzette Terheun and Bernard Tribie, (collectively, "Plaintiffs") have all been actively involved in the efforts of forming a labor association and local affiliate of the International Association of Fire Fighters ("IAAF") to represent the employees of the Rescue Division of the City of Plantation's ("the City") Fire Department. (Am. Compl. ¶¶ 13-14.)   The labor association formed by the Plaintiffs is known as the Plantation Professional Paramedics and EMT's, IAAF Local 4430.  (Am. Compl. ¶¶ 13-14.)  On May 9, 2005, Plaintiffs filed a Fair Labor Standards Act ("FLSA") lawsuit against the City claiming that the City was in violation of the overtime pay requirements set forth in the FLSA.[1]  (Am. Compl. ¶ 26.) On May 21, 2005, Plaintiffs brought an

---

[1] The case settled on November 27, 2006. (Order Granting Motion for Settlement, Pl. Ex. I(2) .)

action claiming that their rights and privileges secured by the United States Constitution have

been violated and that the Defendants engaged in retaliatory and discriminatory acts against

Plaintiffs due to their involvement in the union and/or the FLSA lawsuit.[2] (Am. Compl. ¶¶ 56,

64, 72, 80.)

Chief Robert Pudney ("Pudney") has been Fire Chief of the Plantation Fire Department

since 1989. (Robert Patna Dep. 9, Aug. 17, 2006.) Pudney reports directly to the Mayor, is the

top ranked officer in the Plantation Fire Department and makes final decisions for the department

in areas such as hiring or promotions. (Patna Dep. 12-16.) Deputy Chief Joseph Harris

("Harris") has been Deputy Chief of the Fire Department since 2000. (Joseph Harris Dep. 5, Aug.

16, 2006.) Joel Gordon ("Gordon") has been a Battalion Chief for approximately ten years and

Denise Johnson ("Johnson") has been a Battalion Chief for over four years. (Joel Gordon Dep. 7,

Oct. 3, 2006; Denise Johnson Dep. 4, Oct. 5, 2006.) Gordon is responsible for two rescue shifts

and Johnson is responsible for the remaining two shifts. (Gordon Dep. 17.)

Pudney has the sole authority to issue discipline of employees, but he asks for input from

Gordon and Harris if the discipline concerns employees under Gordon or Harris' command.

(Gordon Dep. 75-76.) Pudney does not need to seek approval of anyone else in the City before

he issues discipline. (Harris Dep. 106.)

The City's Charter provides a procedure for City employees to appeal disciplinary

actions. Specifically, the Charter provides as follows:

---

[2] Specifically, counts one, three and four of the Amended Complaint allege that Defendants' retaliatory actions violated Plaintiffs' First Amendment rights of association, to petition the government for redress of grievances and speech. Count two seeks redress against the City under the FLSA for retaliation based on the filing of a complaint for overtime compensation.

(46) Disciplinary procedure for city employees. The disciplinary proceeding and disciplinary review procedures for all nonprobationary employees of the city, other than elected officials, shall be as follows:
* * *
(2) If an employee desires to contest the disciplinary action proposed by . . . a department head, or their respective designees, he shall be entitled to utilize the following procedure:
A. Within ten (10) calendar days of receipt of notice of the proposed disciplinary action, the employee shall file with the personnel director, or his designee, a written request for a hearing, together with a brief written statement of the reasons for the request. If a request is not timely made, the employee will be conclusively presumed to have concurred in the proposed disciplinary action and such action will become final and binding on the parties.
B. A hearing will be scheduled by the personnel director or his designee not less than ten (10) calendar days from the date of receipt of the hearing request. The hearing will be informal and will be conducted as follows:

****

3. The determination of the personnel director shall be final and binding on the parties in all cases except where the disciplinary action taken involves discharge, reduction in pay, demotion with loss of pay, or suspension without pay for more than five (5) working days. In such cases, employees desirous of contesting such disciplinary action imposed by the personnel director may appeal to the job description committee, . . .

(City Charter, Def. A.1(a).)

_____During Mayor Rae Carol Armstrong's tenure, the "Job Description Committee" has never

4

been called into action and no formal appeal has ever been brought. (Rae Carol Armstrong Dep. 31, Nov. 6, 2006.) Johnson had never heard of the "Job Description Committee." (Johnson Dep. 75.) The Mayor could not recall an instance when the personnel director had reversed any of Chief Pudney's actions. (Armstrong Dep. 31.) Mayor Armstrong testified that she doesn't "give orders to department directors" who are "very independently functioning professionals." (Armstrong Dep. 33.)

The City's policy regarding secondary employment, Policy #96-06, outlines the procedures for an employee seeking approval for secondary employment, and states in pertinent part as follows:

> All City of Plantation Fire Department employees may engage in part-time secondary employment, subject to the following provisions:
>
> 1. An employee planning to undertake secondary employment shall disclose all facts concerning such employment, in writing, on the Off Duty Employment Notice Form, to the Battalion Chief, prior to accepting or engaging in the employment.
>
> 2. In reviewing the request, the Battalion Chief and the employee should discuss the various ramifications of the secondary employment, upon the employee's primary job. The Battalion Chief shall investigate to see that all provisions of this policy are met. The Battalion Chief shall attach a written recommendation and justification to approve or disapprove the request.
>
> 3. The request shall then be submitted to the Fire Chief, or his designee, for approval or disapproval. The Fire Chief shall maintain the written disclosure and signed approval.
>
> 4. Approved secondary employment is valid for one calendar year and must be resubmitted annually, prior to December 31st. Failure to resubmit will result in a loss of secondary employment privileges.

5

> 5. The Fire Chief reserves the right to require any employee to discontinue any secondary employment if, at the Fire Chief's discretion, the outside employment is a violation of this policy. Failure to comply with such an order will result in disciplinary action.
>
> * * *
>
> Special Note 1: It is the employee's responsibility to notify his or her Battalion Chief of any major changes in the nature of secondary employment.

(City of Plantation Fire Department Policy 96-06, Def. A.2.)

_____The City's policies regarding Leave Without Pay - Medical - 670.0 and Leave Without Pay - Other -680.0 provide that "an employee on an approved medical leave or other leave of absence who becomes gainfully employed will automatically terminate his/her leave without pay status and jeopardize his/her future employment with the City." (Revised Family and Medical Leave Policy, Def. Supp. A.1.)

In 2000, Diaz and Poole sought to unionize the fire department. (Diaz Dep. 5, July 18, 2006.)  Soon thereafter, Harris conducted a two and one-half hour meeting with Poole, in which he prohibited Poole from distributing written information or soliciting members. (November 17, 2000 letter from Poole to Patna, Pl. Ex. A.)  Harris told Diaz that if unionization occurred, ambulances would be removed from the firehouses and the fire department could be dissolved. (Diaz Dep. 6.)   The  union lost that vote. (Harris Dep. 8.)  After that, the City moved from a 12-hour shift system to a 24-hour shift system, a change favored by employees. (Gordon Dep. 14-15.)

_____In February of 2005, Plaintiffs began another union drive and began speaking to co-workers about unionization. (Del Rosario Decl. ¶ 2; Diaz Decl. ¶ 5; Kluver Decl. ¶ 1; Neri Decl.

6

¶ 1; Poole Decl.  ¶ 1.)  Soon the Plaintiffs created a website, including a photograph of the

founding members of the union: Diaz, Neri, Poole, Terheun, Tribie, and Del Rosario.  Diaz saw a

printout of the photograph outside Gordon's office. (Diaz Decl. ¶ 5.)  Interest cards were

submitted in March of  2005 to the Florida Public Employee Relations Commission ("PERC") in

support of a petition for representation. (Union Interest Cards, Pl. Ex. B; Poole Decl. ¶ 8.)

Elections of officers for the local resulted in Poole being the President, Neri elected Treasurer,

Diaz elected Secretary and Terheun elected Vice President. (Poole Decl. ¶ 2.)  Del Rosario and

Tribie were appointed to the Executive Board. (Del Rosario Decl. ¶ 1;  Poole Decl. ¶ 2.)

        Pudney arranged a meeting for all employees on March 3, 2005 about the union. The

meeting was attended by Mayor Rae Carol Armstrong, City Personnel Director John McKenica,

City Labor Attorney James Crosland, Pudney, Harris, and Gordon, and other senior Fire

Department officers.[3] (Armstrong Dep. 9-14; Gordon Dep. 33.)  At the meeting, Pudney

---

[3] Such meetings like these were infrequent, and Harris could only recall one other such
meeting that had occurred during a previous union organizing campaign. (Harris Dep. 20-21.)  At
that previous meeting, Gordon stated that employees were informed of the City's options if the
employees were successful in organizing a union at the department and achieving collective
bargaining, which included having employees stand post rather than stay at the station, moving
the Rescue Division to the Police Department, and privatizing the Rescue Division. (Gordon
Dep. 12-13.)  "Stand post" meant that Rescue Division employees would not be permitted to
spend time between calls at the existing Plantation Fire Department stations, but rather would be
forced to sit at intersections or other "posting locations" when they were not running calls.
(Gordon Dep. 13.)  Pudney, Harris and Gordon informed the Rescue Division employees of these
options. (Gordon Dep. 16-17, 137-38.)  Employees were opposed to moving to a stand-post
system, or privatization. (Gordon Dep. 18-19.)  The record is not entirely clear as to whether
these same options were conveyed to employees in the 2005 drive.  Plaintiffs cite to page 13 of
the Gordon deposition transcript to support the contention that these options were conveyed but
the record shows that Gordon was asked about the 2000/2001 organizing effort.  It is unclear
from Gordon's testimony on page 26 and 37 of his deposition whether he is referring to the 2005
organizing effort when he states that privatization, returning to 12 hour shifts and merging with
the police department were being considered.

expressed that he felt threatened by the union and that unionization would result in forcing the volunteer division of the fire department to "go paid."[4] (Poole Decl. ¶ 4.) Mayor Armstrong stated that she was "disappointed" that things had come to this and that the City would "protect the volunteers at any cost." (Armstrong Dep. 17; Pudney Dep. 53; Poole Decl. ¶ 4.) James Crosland, the city attorney, stated that the City had the right to privatize the Rescue Division, and that the decision was the City's alone. (James Crosland Dep. 10, Nov. 28, 2006.) Harris acknowledged that employees were afraid of retribution for bringing their concerns to him or other management officials. He then turned directly to Poole and asked Poole if Harris had ever shown retribution to Poole.[5] (Poole Decl. ¶ 5.)

On March 4, 2005, Harris came to a fire station and spoke with two union members, including Tribie, in Gordon's presence, about unionization and how private ambulances might take their jobs. (Gordon Dep. 39; Tribie Dep. 19-20, July 17, 2006.) At various meetings, Harris told employees not to discuss the union while at work. (Harris Dep. 26-27.) When asked by employees about the City's position on the union, Gordon stated that the City was "concerned" because the overall interest of the union had nothing to do with the Rescue Division, and that the union wanted to eliminate the volunteers. (Gordon Dep. 29.) In response, the union sent a letter to members of the Plantation Volunteer Fire Association to dispel some of the rumors about the union and, in particular, to reassure the volunteers that Local 4430 was not formed to force the

---

[4] At other times, not at this meeting, Pudney had made the statement that the union wished the department to "go paid." (Pudney Dep. 51.) The Rescue Division is paid. however, There is a division of the fire department, however, that is volunteer.

[5] Pudney recalled that Poole was addressed at that meeting, but could not recall if it was by Harris or someone else. (Pudney Dep. 55.) Gordon had heard some "hearsay" that some people were afraid of retribution. (Gordon Dep. 37.)

City to move to an all-paid fire department.[6] (Letter from Union, Pl. Ex. C.)  That letter resulted in Harris and Gordon ordering Poole, Diaz and Neri to a police station to be questioned about the method used to obtain the addresses to send the letters. (Diaz Decl. ¶ 7; Neri Decl. ¶ 7; Poole Decl. ¶¶ 9-10.)  On September 8, 2005, the Office of the State's Attorney found no merit in this criminal investigation of Poole or the others with respect to obtaining of the addresses. (State Attorney's Memo, Pl. Ex. K.)

In early April of 2005, Harris told Poole that the City would privatize the Division if the employees voted in favor of a union in the Department. (Harris Dep. 29-30; Poole Dep. 30-31.) Poole wrote a letter three days later, on April 15, 2005, to Harris, Pudney, Mayor Armstrong and five members of the City Council expressing the concerns of the union as to the threat of privatization made by Harris. A follow-up letter was sent on April 20, asking for their position on the threat of privatization. (April 15, 2005 Letter from Poole to Harris, Pl. Ex. D(1); April 20, 2005 Letter from Poole to Mayor Armstrong, Pl. Ex. D(2).)  Poole received no response from the City, except he received a telephone call from a City council member who told Poole that she was personally opposed to the union so long as the fire department remained a volunteer department. (Poole Decl. ¶ 8.)

Starting on or around April 17, 2005, someone posted anti-union flyers throughout the department stations, claiming that "this so called union, or club . . . does not support volunteers in the fire service."  (Flyer, Pl. Ex. E; Gordon Tr. 40-42.)  The repeated posting of these flyers

---

[6] Poole drafted the letter. (Union letter, Pl. Ex. C; Poole Decl. ¶ 7.)  Poole mailed the letter to the home addresses of the volunteers using the official contact listings available to all employees of the fire department.  Poole collected the volunteers' addresses because they were friends and coworkers who knew him and saw him regularly. (Poole Decl. ¶ 9.)

was a violation of Harris' instruction not to discuss the union while on the job, but Harris did not conduct an investigation. (Harris Dep. 35-38.)  On May 17, 2005, the plaintiffs and IAFF Local 4430 formally withdrew their petition with PERC for an election. (May 17, 2005 Letter from Diaz to Sharon Zahner, Pl. Ex. F.)

Harris approached Poole in late May of 2005, and initiated a conversation in front of the rest of the on-duty crew, criticizing Poole and others for having brought the FLSA overtime compensation lawsuit and calling it "frivolous."  Harris claimed that the City will fight the case all the way, and that even if it loses, he and other officials will countersue the plaintiffs. (Gordon Dep. 48-49; Johnson Dep. 37-38; Poole Decl. ¶ 6.)  Harris then said to Poole that "you and I need to get far away from the City and have a talk."  When asked what needed to be discussed away from the City, Harris said "where we go from here."  (Poole Decl. ¶ 6.)

_____Harris stated that plaintiffs would be countersued for the cost of litigating the case and he told employees that because of the FLSA lawsuit, they would be denied raises under the City's pay plan. (Gordon Dep. 53; Robert McDearmid  Dep. 27-28, Oct. 6, 2006.)  Harris also told employees that people involved in the FLSA lawsuit would be marched out of the courtroom in handcuffs because they had lied in depositions. (Johnson Dep. 37.)

At a January 31, 2006 mediation of the FLSA case, Pudney and Harris were surprised to learn that Deven Anderson, a paramedic, was still a plaintiff in the suit. (Harris Dep. 43-44; Anderson Dep. 13-15, Oct. 5, 2006.)   The following day, Anderson was ordered by his lieutenant to cease crew chief training. Harris gave the order to his lieutenant.  (Gordon Dep. 50.) Anderson asked his lieutenant to request Harris to provide the order in writing. (Deven Anderson Dep. 14- 15, Oct. 5, 2006.) Harris told him that he was not going to give Anderson anything that

10

could be used against him, that he did not trust him and that others do not view Anderson as a leader due to the lawsuit. (Anderson Dep. 16-18.)  Anderson's crew chief training resumed after Anderson resigned from the union and left the suit. (Anderson Dep. 20-21.)

_____During April of 2006, Harris attended shift meetings and raised the subject of the FLSA lawsuit, calling union members who had brought the suit "cowards" and turning to a union member (and FLSA plaintiff), Rosa Allen-Meizoso, and saying, "Rosa, you're a coward." (Gordon Dep. 62; Scott Reed Dep. 25-27, Oct. 4, 2006.)

According to Lieutenant Scott Reed, at one meeting Harris took a page of names, read them aloud, and asked, "what"s the common denominator of these names?" Someone said, "the union is the common denominator," and Harris said, "That's right. And I put all my problem children on [this] shift because this is the leper shift." (Reed Dep. 28-29.)  Harris also stated that the administration would move union people to shifts to make them unhappy or miserable enough that they would quit. (Diaz Dep. 26, 29-30, 61-62.)  Harris questioned Diaz in front of co-workers, none of whom were union supporters, about who was in the union. (Diaz Dep. 31-32.)

In late May of 2006, Harris called shift meetings to denounce the retaliation and FLSA lawsuits and the union. He reiterated at these meetings the threat that the department will not provide raises to the personnel because of the lawsuits and called Del Rosario a hypocrite for attending leadership training provided by the department, arguing that her participation in the union showed she didn't care about the department. (Del Rosario Decl. ¶ 20.)  Gordon speculated that Harris said this because Del Rosario was involved in trying to destroy the Rescue Division and, at the same time, taking a class to lead the organization. (Gordon Dep. 63-64.)

11

Gordon believes that pursuing the lawsuits against the City, and constant threats of bringing back the union were an effort to create a split within the organization. (Gordon Dep. 66.)  He believes that the members of the union wanted to anger the City administration and break the division apart. (Gordon Dep. 66-68.)

Mayor Armstrong, in the course of discussions with the fire chief about a union effort, stated that "we don't need the adversarial kind of relationships that usually come with a union or unionization . . ."  She also has said that "I don't feel like there is a need for a union in the City of Plantation in this area" and that "[t]here's no question that that is my belief as far as the topic of unionization is concerned."  (Armstrong Dep. 34.)  The Mayor has made her position "[v]ery clear" to Pudney, even before the 2005 unionization campaign. (Armstrong Dep. 35.)  In 2001, Mayor Armstrong wrote a letter directly to Diaz expressing her vigorous opposition to a union in the department.  (January 11, 2001 Letter from Mayor Armstrong to Diaz, Pl. Ex. G.)

Johnson considered the union to be a "threat" to her. (Johnson Dep. 23-25.)  Johnson acknowledged that lieutenants had expressed the fear that the FLSA suit would cost employees their raises. She told employees that she didn't know "how [the lawsuit] was going to affect anything and that everything was on the table."  (Johnson Dep. 34.)  She made these statements to subordinates based on what Pudney and Harris told her.  (Johnson Dep. 35.)  Johnson also admitted she has told subordinates, including at least three lieutenants, that "I wouldn't give them [union supporters] the opportunity to swap [shifts] with me."  (Johnson Dep. 48-50.)  She also said to lieutenants under her command that "if it were me," she would not agree to work overtime shifts so that union supporters use their leave. (Johnson Dep. 51-55.)  Johnson has even confronted subordinate employees who are not in the union, asking them "why do you associate

12

with these people" in reference to union members. (McDearmid Dep. 17.)  Johnson yelled at an

employee for sitting with Diaz at a City event. (McDearmid Dep. 22-23.)  When another

employee protested this abusive conduct to Harris, Harris angrily defended Johnson, and stated

that he supported her behavior.  (McDearmid Dep. 24-25.)

In November of 2006, following the settlement of the FLSA lawsuit, Pudney called a

meeting of Rescue Division employees. Harris and Gordon also attended.  Pudney said "we're

going to fight the [SOBs]" who brought the suit. (Del Rosario Decl. ¶ 24.)   Harris explained that

pay raises would be delayed, but that each employee could expect a pay raise to come in October

of 2007. Each employee received a sheet explaining what their pay raise would be at that time.

Harris then went on to talk about the union and the lawsuit; he grabbed a sheet out of one

employee's hand, held it up, and said "but if we get collective bargaining in the Division, you can

kiss this goodbye." (Del Rosario Decl. ¶ 25.)  Finally, Harris made threats to employees that it

would be "very easy" to bring in private contractors to replace employees. (McDearmid Dep.

19-20.)

*Bernard Tribie*

Bernard Tribie was hired as an Emergency Medical Technician in the Rescue Division of

the City's Fire Department on August of 2001.  He resigned in 2005. (Tribie Dep. 11-12.)  Tribie

served on the executive board of the union. (Poole Decl. ¶ 2.)  When Tribie first started working

for the City, he also worked part-time for a private ambulance company.  At that time, Tribie

filled out a secondary employment form and obtained approval for that job. (Plantation Fire

Department Off Duty Employment Notice, Bernard Tribie, dated 10/08/01, Def. A.4.)  Shortly

after this, Tribie started an automobile detailing business,[7] but was told by his supervisor, Lieutenant Victor Delarosa, that he did not need to fill out a secondary employment form since he would be working for himself and thus able to schedule his secondary employment hours around his job as an EMT. (Tribie Dep. 15-16.)  Tribie followed his supervisor's advice and did not fill out a secondary employment form. (Tribie Dep. 15-17.)  During the course of Tribie's employment with the City, Tribie owned several other businesses, including a used car dealership known as Certified Automotive.  Tribie did not seek approval to work at Certified Automotive. (Tribie Dep. 12-15.)

On or around May 19, 2005, Harris learned for the first time in a conversation with Diaz and Terheun that Tribie was a member of the union's executive board. (Diaz Decl. ¶ 8.)  On May 23, 2005, Tribie was called into Harris' office and questioned about his secondary employment and the fact that Tribie had not sought approval for his secondary employment.  (Tribie Dep. 12-14.)   Harris informed Tribie that an investigation would be conducted regarding Tribie's secondary employment. (Tribie Dep. 15, 32-33.)  Harris told Tribie that he had done some research and discovered that Tribie had a second job. (Harris Dep. 225.)  Harris has only investigated Tribie, Neri, Poole and one other employee, Carlos Guzman, regarding secondary employment. Guzman was not disciplined for a secondary employment violation. (Harris Dep. 62, 65, 204.) Harris informed Tribie that he could not have a second job until it is approved, and Tribie told Harris that he could not wait for the second job to be approved and that he would need to quit his job with the City of Plantation. (Harris Dep. 225-226.)  Tribe did not want to have an investigation into his personal finances. (Tribie Dep. 32-33.)  After the meeting with

_____

[7] Harris knew about Tribie's automobile detailing business. (Tribie Dep. 27.)

Harris, Tribie decided to resign from his position with the City because he needed the income from his secondary employment. (Letter of Resignation, Def. A.5.)  Tribie did not inform Pudney (or any other City official) that he thought Harris was forcing him to resign from his position at the City.  Tribie claims that this was due to the fact that he believed it would not have made any difference. (Tribie Dep. 33.)

*Stephanie Kluver*

Kluver worked as a paramedic in the Rescue Division of the City's Fire Department from 2003 to 2005. (Kluver Dep. 4, 7, July 21, 2006.)  In late February or early March of 2005, Kluver joined Local 4430. (Union Cards, Pl. Ex. B; Kluver Dep. 13-14.)  She did not share the fact of her membership in the union with Defendants. (Kluver Dep. 14-15.)  Prior to working for the City, Kluver was employed as a full-time paramedic/field training officer at American Medical Response ("AMR"). (Kluver Dep. 5-7.)  Kluver decided to work part-time at AMR and to become a full-time paramedic at the City due to the stability and benefits offered by the City. (Kluver Dep. 6.)  In 2005, Kluver's father became critically ill and needed a second heart transplant. (Kluver Dep. 7.)  Kluver then became her father's primary care-taker and she wanted to resign from her job at the City and work at a job which offered her flexibility to take time off to care for her father.  (Kluver Dep. 7.)  Kluver informed her lieutenant, Leslie Alanez, that she wanted to resign.  Alanez suggested that Kluver take leave pursuant to the Family Medical Leave Act ("FMLA") instead of tendering her resignation. Alanez also suggested that Kluver speak with her battalion chief, Gordon. (Kluver Dep. 8.)  According to Defendants, Alanez told Kluver

that she could not work another job while on FMLA leave.[8] (Leslie Alanez Dep. 53, Oct. 4, 2006.)  According to Kluver, she was not told her that she was not permitted to continue her outside employment while on leave of absence. Kluver never stated to any personnel that she had not been working at AMR during her leave of absence, and that she never agreed to cease her secondary employment while on leave of absence. (Kluver Dep. 32-33; Kluver Decl. ¶ 4.)

Gordon told Kluver that he did not want her to resign because she was a good employee. Gordon was very supportive and indicated that Kluver should take FMLA leave rather than resign. (Kluver Dep. 9.)   On March 18, 2005, Kluver submitted a letter to Pudney requesting FMLA leave. (Letter to Pudney from Kluver dated March 18, 2005, Def. A.8.)  On April 8, 2005, Pudney sent a letter to Kluver enclosing sections of the Plantation Employees Handbook titled "Leave Without Pay - Medical, Section 670.0" and "Family and Medical Leaves of Absence, Section 680." Pudney instructed Kluver to review the documents and to complete the requisite forms for her leave. (Letter to Kluver from Pudney dated April 8, 2005, Def. A.9.) On April 14, 2005, Kluver acknowledged receipt of documents pertaining to:  (1) a Memorandum Response to Request for FMLA leave; (2) Application for Family and Medical Leave; (3) Certification of Health Care Provider and (4) a copy of the U.S. Department of Labor Notice entitled "Your Rights under the Family and Medical Leave Act of 1993." (City of Plantation Receipt, dated April 14, 2005, Def. A.10.)  On that same day, Kluver filled out and signed an application for leave stating the reason for the leave was due to the illness of her father. (City of Plantation Application for Family and Medical leave, dated April 14, 2005, Def. A.11.)

---

[8] Harris was aware that Kluver had a second job prior to Kluver taking FMLA leave. (Harris Dep. 152.)

On April 28, 2005, Pudney notified Kluver that the City had received her signed application for Family and Medical leave, but that the required medical certification had not yet been received. Pudney indicated that Kluver had up until May 7, 2005 to either provide the medical certification or report to duty. (Letter to Kluver from Pudney, dated April 28, 2005, Def. A.12.) On May 6, 2005, Kluver submitted a faxed copy of the medical certification to the personnel department who in turn faxed a copy to fire administration. (Formal Inquiry of Stephanie Kluver, dated May 20, 2005, Def. A.13.) Fire administration noted that the faxed copy of the medical certification had been sent to Kluver at AMR on May 4, 2005. Gordon then contacted AMR to determine whether Kluver had worked at AMR on that date. (Formal Inquiry, Def. A.13.)

On May 9, 2005, Gordon and Harris went to AMR to determine whether Kluver had been working for AMR while on leave from the City. (Kluver Dep. 35-37.) At some point in May of 2005, Kluver was notified that Harris would conduct a Formal Inquiry regarding her alleged violation of the City's policy concerning working at another job while on FMLA. (Formal Inquiry, Def. A.13.) After conducting the Formal Inquiry, Harris recommended that Kluver be terminated for the violation of City and Departmental policies. (Formal Inquiry, Def. A.13.) Upon receiving the Formal Inquiry, Kluver did not contact anyone at the City to dispute the statements. (Kluver Dep. 37.) Kluver was scheduled to meet with Pudney to discuss the charges in the Formal Inquiry as well as Harris' recommendation of termination. However, she did not do so and, instead, on May 25, 2005, submitted a letter of resignation to Pudney due, in part, to the Formal Inquiry and due to her father's terminal condition.[9] She also believed that, if she

_____

[9] Kluver's letter thanked Gordon for his concern and kindness. To Kluver's knowledge, Gordon never threatened her based on her union activity. (Kluver Dep. 46.)

17

returned, it would not be on good terms. (Kluver Dep. 38, 41; Kluver Decl. ¶ 2; Letter to Pudney

from Kluver dated May 25, 2005, Def. A.14.)

*Jude Diaz*

Diaz was hired as an emergency medical technician in the Rescue Division of the City's

Fire Department on September 9, 1996.  (Diaz Dep. 4.)  Diaz first became involved in the efforts

to unionize the Rescue Division in the latter part of 2000. Diaz's involvement included speaking

with union organizations to obtain information regarding the formation of the union and

disseminating interest cards. (Diaz Dep. 5.)  Diaz was also involved in the second attempt at

unionization in 2003, which included discussing the possibility of the union with his

co-workers.[10]  (Diaz Dep. 12.)  Diaz attempted to organize a union, but refrained from

continuing, after threats that the department would be eliminated or placed under control of the

police department, and that 24-hour shifts would be eliminated in favor of returning to the

12-hour shift system in place before the Summer/Fall of 2001. (Diaz Dep. 12-13; Diaz Decl. ¶ 2.)

In 2005, a local chapter of the IAFF, Local 4430, was established and Diaz was elected Secretary.

(Diaz Dep. 22.)

In 2003, Diaz was the subject of a formal inquiry by Harris regarding a delayed response

call involving Neri on June 6, 2003.  (Formal Inquiry for the matter of Thomas Neri, Def. A.16;

Diaz Dep. 12 -15.)  Harris recommended that Diaz and Neri receive formal reprimands for the

delayed response call. However, Pudney found that there was insufficient evidence to support the

charges against Diaz and, thus, cleared Diaz of the charges. Diaz did not receive any discipline as

---

[10] According to Diaz, the union drive in 2003 was an "attempt" that never got to the
voting stage and just involved discussions with employees.  Prior to that "attempt," in
2000/2001, there was a union drive that actually went to ballot.  (Diaz Dep. at 12.)

a result of that incident. (Diaz Dep. 13-15.)  Prior to June 6, 2003, Diaz had been recommended

for discipline due to tardiness, but that was later removed from Diaz's file. (Diaz Dep. 15.)

      In the beginning of 2005, Johnson told Diaz that if Diaz did not like the fire department,

he should leave. (Diaz Dep. 24.)  On March 17, 2005, Local 4430 sent a letter to the members of

the Plantation Volunteer Fire Fighters Association regarding the formation of the union. Diaz

was involved in the preparation of the letter. (Diaz Dep. 36-38.)   On May 23, 2005, Harris

ordered Diaz's crew to report to station headquarters.  Harris and Gordon ordered Diaz into the

back of the car and Diaz was told he would be talking to a police officer. (Diaz Dep. 36-37;

Gordon Dep. 107; Harris 111-15; Diaz Decl. ¶ 7.)  Diaz was questioned by a detective. (Diaz

Dep. at 37.)  On October 10, 2005, Harris ordered Diaz to his office, where Gordon and Johnson

were present.  Harris did a "fact-finding" about the Local's letter to the volunteer firefighters and

told Diaz that he would be prosecuted for perjury and that the overtime lawsuit was a "personal

attack."  Harris also stated that the "rumors" that criminal charges against Poole, Neri and Diaz

had been dropped were untrue and that the charges were "only the beginning" and that this is "far

from over."  Finally, Harris stated that "someone" has to "give in and end all this." (Gordon Dep.

112-14; Diaz Decl. ¶ 14.)

      In April of 2005, Diaz's shift was changed and Gordon became his new battalion chief.

(Diaz Dep. 40.)  Prior to the shift change, Diaz had obtained approval from Harris to take time

off for a cruise in September of 2005. (Diaz Dep. 42.)  Some time after the shift change, Gordon

informed Diaz that he had lost the privilege to take annual leave and work overtime based on his

taking of three sick days in a month. (Diaz Dep. 18-19; Harris Tr. 115-16; Gordon Tr. 108-09;

Diaz Decl. ¶ 10.)  At some point, after a meeting occurred between Diaz and Harris, Harris

rescinded Gordon's denial of Diaz's time off. (Diaz Dep. 19-21, 41.)  Diaz was not able to take

the cruise, however, because the price of the cruise had gone up in price. (Diaz Dep. 41-42, 44-

45.)  Diaz was forced to reschedule the cruise and pay approximately $1,800.00 more for the

cruise, or else lose the deposit. (Diaz Decl. ¶ 11.)  During this same time period, Gordon denied

another request for leave by Diaz. (Diaz Dep. 39-40.)  According to Diaz, Gordon told him that

he was denying him leave because of Diaz's participation in a lawsuit where Gordon was being

sued personally. (Diaz Dep. 39-40.)  When Diaz later requested leave to take care of his wife

who had suffered a stroke, Johnson told Diaz that his request would be granted, but that Diaz had

to "stop talking union." (Diaz Dep. 47-48.)

In May of 2005, Harris recommended that a letter of reprimand be placed in

Diaz's personnel file due to his involvement in a delayed response call involving Terheun

on April 18, 2005.  Diaz and his crew members responded to the emergency rescue call more

than twenty minutes late. (Formal Inquiry for the Matter of Suzette Terheun, Def. A.17.)

Nonetheless, Diaz did not receive a letter of reprimand. (Diaz Dep. 18.)

In late July of 2005, Harris told Diaz that he would not be permitted to take any

additional leave for the rest of the calendar year, even though Diaz's "unused leave would

expire."  Diaz appealed and the order was rescinded. At the appeal hearing, Harris stated, "I have

a group saying that I am punishing you unnecessarily." (Diaz Decl. ¶ 13.)

In August of 2005, after an incident between Gordon and Del Rosario, Gordon screamed

at Poole and Diaz for bringing the overtime lawsuit and starting the union and told them that they

were ruining the department because of their participation in the overtime lawsuit and

union-organizing efforts.  (Gordon Dep. 110-11; Diaz Decl. ¶ 12.)

In January of 2006, Gordon told Diaz not to address him but to communicate through Diaz's lieutenant. (Diaz Decl. ¶ 15.)  On February 23, 2006, Gordon approached Diaz, clenched his fists, and told Diaz to take "a shot at him" while "screaming." (Gordon Dep., Vol. II, 10; Diaz Dep. 52-55.)  Gordon accused Diaz of being involved in the posting of the picture of Gordon's wife and daughter at a union rally. (Diaz Dep. 54-55.)  Diaz told Gordon that he had no role in the publication. (Gordon Dep., Vol. II, 4-6, 9-10; Diaz Dep. 54.)  Diaz reported the incident to Harris later that day and Harris spoke with both Diaz and Gordon and instructed each of them to submit an incident report. (Diaz Dep. 55.)  Lieutenant Jensen observed this incident and was shocked by Gordon's behavior. (Rebecca Jensen Dep. 59-63, Oct. 3, 2006.)

In March of 2006, Diaz's shift was changed for a second time due to Harris' concerns about Gordon acting as Diaz's battalion chief in light of the February 23, 2006 confrontation. (Diaz Dep. 52.)  On August 28, 2006, Harris conducted a Formal Inquiry regarding the incident and, on September 18, 2006, Pudney scheduled a pre-determination hearing on September 29, 2006. (Formal Inquiry for the matter of Battalion Chief Joel Gordon, dated August 28, 2006, Def. A.18.; Letter to Gordon from Pudney, dated September 18, 2006, Def. A.19.)  On October 5, 2006, Pudney issued a letter of reprimand to Gordon for violation of Department Policy #94-1, Mutual Respect. (City of Plantation Fire Department Policy # 94-1, Def. A.20.)  Gordon was ordered to complete the City's Conflict Resolution Program within sixty days.  (Letter to Gordon from Pudney, dated October 5, 2006, Def. A.21.)

In May of 2006, Harris asked Diaz questions about the lawsuit and union membership, but Diaz refused to answer.  Harris stated that union supporters were "cowards." (Diaz Decl. ¶ 16.)  After that meeting, Harris saw Diaz in the parking lot and Harris "bent down [and] spread

his cheeks in [his] direction." (Diaz Dep. 62.)   That same day, Lieutenant Ezra Lebow and two

other lieutenants exited the station and Lebow made a similar gesture to Diaz. (Diaz Dep. 62.)

　　　Diaz's lieutenant told him that people hate Diaz because of his union work and that they

"are no longer friends."  Diaz's co-employees on the B-shift who are opposed to the union refuse

to communicate with Diaz.  (Diaz Decl. ¶ 17.)  In December of 2006, Diaz was moved to another

shift and Harris told him that he should be "happy" to get a "break" from the anti-union shift and

suggested that Diaz disband the union. (Diaz Decl. ¶ 18.)

_Sivy Del Rosario_

　　　Sivy Del Rosario was hired as a paramedic for the Rescue Division of the City's Fire

Department in 1998. (Del Rosario Dep. 6-7.)  In 2001, Del Rosario signed a union card and

attended an informational meeting regarding the first attempt at unionization. (Del Rosario Dep.

9-10.)  Del Rosario is currently involved in the third attempt to unionize the Rescue

Division and is a member of Local 4430's executive board and the special events coordinator.

(Del Rosario Dep. 10-13.)

　　　In May of 2005, Harris recommended that a letter of reprimand be placed in

Del Rosario's personnel file due to her involvement in a delayed response call involving

Terheun and Diaz on April 18, 2005. (Formal Inquiry for the Matter of Suzette Terheun, Def.

A.17.)  Despite Harris' recommendation, Del Rosario did not receive a letter of reprimand. (Del

Rosario Dep. 60.)

　　　During that same time period, Del Rosario requested a light duty assignment because of

surgery on her wrist.  Del Rosario mentioned her need for light duty to Gordon, who told her that

she needed to put the request in writing. Two hours later, before she could write the letter,

Gordon told Del Rosario that her request for light duty was denied. (Del Rosario Dep. 19.)  On

May 26, Harris told Del Rosario that he had talked to Pudney and that her request for light duty

would be denied.  Specifically, Harris asked her "do you really think you will get light duty after

everything that's been going on here, and with this lawsuit." (Del Rosario Decl. ¶ 3.)  Del

Rosario did not file an appeal of Harris' decision with Pudney. (Del Rosario Dep. 23.)  Pudney

told Gordon that Del Rosario's request for light duty in 2005 was denied because no position was

available to be filled. (Gordon Dep. 80.)  Neither Harris nor Pudney could name an employee

who had been denied light duty. (Harris Dep. 107; Pudney 99-100.)  Gordon could recall only

Del Rosario's denial and thought that two or three others might have been denied light duty, but

could not recall their names or any other information about them. (Gordon Dep. 79-80.)   Indeed,

between March of 2003 and March of 2006, at least 8 employees were granted a request for light

duty. (Documentation of light duty requests, Pl. Ex. 6.)  Previously, Del Rosario had been

granted light duty for a 2001 pregnancy. (Del Rosario Decl. ¶ 4.)

Del Rosario had surgery on June 4, 2005. Having been denied light duty, Del Rosario was

forced to take sick leave and annual leave. (Del Rosario Decl. ¶ 5.)  On or about her return, on

July 27, 2005, Del Rosario was told that, under Harris' orders, she could not work overtime

hours or swap shifts with other employees.  She was also told that she would be evaluated by the

department due to her extended absence. (Del Rosario Decl. ¶ 6.)  According to Gordon, Del

Rosario was under review for being a "substandard medic with a poor performance history and

very poor attendance record." (Gordon Dep. 84.)  He acknowledged that this review was not

related to enforcement of any policy. (Gordon Dep. 84.)

Shortly after Del Rosario returned from her carpal tunnel surgery, another employee

23

requested to swap shifts with Del Rosario. (Del Rosario Dep. 26.)  Gordon denied that request

and sent an email to Del Rosario informing her that she was being placed on a thirty day

re-evaluation period and would not be eligible to swap shifts, take annual leave, or work

overtime during that period. (Del Rosario Dep. 26.)   Del Rosario did not appeal Gordon's

decision to place her on the reevaluation period or his decision to prohibit her from taking annual

leave, swap shifts, or work overtime during the re-evaluation period. (Del Rosario Dep.29.)

At some point in 2005, Gordon and Johnson both issued orders to Del Rosario that they

were not permitted to communicate with either of them without having her lieutenant present.

(Gordon Dep. 87-88, 114-15; Johnson Dep. 61.)  Harris issued an order that Del Rosario should

leave the room when he enters it so there is no miscommunication and to avoid Del Rosario

feeling threatened. (Harris Dep. 108; Nesmith Dep. 23-24.)

On August 9, 2005, Del Rosario was involved in a verbal confrontation with Gordon

regarding the status of her re-evaluation period.  (Del Rosario Dep. 31.)  Gordon started yelling at

Del Rosario and told her that he was sick of her, that he would write her up for insubordination if

he heard her name one more time, and that she had sued him and was ruining the department.

(Del Rosario Dep. 32; Gordon Dep. 82.)  Although Gordon did not make any physical threats to

her, Del Rosario felt threatened by Gordon. (Del Rosario Dep. 33.)  Later that same day, Harris

approached Del Rosario and told her that he would conduct a fact finding into the incident with

Gordon, but that he did not want to discuss the incident until that time. (Del Rosario Dep. 34.)

To date, a fact finding into that incident has not occurred. (Del Rosario Dep. 39.)

After the confrontation, Del Rosario was upset and requested time off from the rest of the

shift. Harris accused her of playing games, extended her evaluation period another 60 days,

removed her shift swap privileges and eligibility for overtime until the end of the year, and moved her to a station where she would be subject to closer scrutiny by Gordon. (Del Rosario Decl.¶ 8-9.)  Del Rosario's overtime and shift swap privileges were not restored until January 2006 but she still has trouble getting co-workers to swap shifts with her.  (Del Rosario Decl. ¶ 11.)

In late 2005, Del Rosario, Gordon gave Del Rosario a failing performance evaluation. (Gordon Dep. 84-85.)  Gordon informed Del Rosario that she could appeal the evaluation to Harris if she was not satisfied with it. (Del Rosario Dep. 14-16.)  Del Rosario appealed the failing evaluation and Harris told her that she had passed. (Del Rosario Dep. 17-18.) According to Del Rosario, Gordon told her that she failed because of her involvement in the union and the overtime lawsuit and, when Gordon said that, Harris stopped the meeting.  Del Rosario's evaluation was later shredded. (Del Rosario Dep. 14; Del Rosario Decl. ¶ 10.)

Despite several requests in late 2005, Del Rosario was refused requests to be measured for a new dress uniform that was needed because she had become pregnant. Eventually unable to fit into her dress uniform, she arrived on shift wearing the weekend and evening uniforms issued by the department referred to as jump suits. She was repeatedly berated for this action by the Chiefs. (Del Rosario Decl. ¶ 23.)  In addition, Gordon and Johnson ordered that all employees must wear dress whites at all times, and told subordinates that if they had a problem with it, they needed to talk to [Del Rosario] about it. (McDearmid Dep. 31-32.)

Following a union rally at City Hall, in January of 2006, Johnson told Del Rosario that if she was unhappy, she and the union supporters should just leave. (Johnson Dep. 62.)  According to Del Rosario, Johnson shouted at her for several minutes in front of co-workers, and accused

her of "ruining the department" by bringing a lawsuit against the City.[11] (Del Rosario Decl. ¶ 13.)

In early February of 2006, anti-union flyers were posted throughout Del Rosario's station. The flyers were placed in each stall of the women's restroom and on the restroom fixtures, the shower stalls, on and inside the microwave, in the refrigerator, and several other conspicuous places. Multiple copies of the same flyers are often also taped all over her locker. (Gordon Dep. 88-89; Del Rosario Decl. ¶ 15.) Pudney was aware of the flyers being posted and spoke to his staff about it. (Pudney Dep. 79-82.) Harris knew about the flyers and spoke with a captain in an effort to stop the postings. (Harris Dep. 96-97.)

As a general rule, employee spouses are not prohibited from visiting stations but Del Rosario's husband was prohibited from visiting her. (Gordon Dep. 90-91.) Del Rosario's husband could not visit because her husband is a union member at another department. (Del Rosario Decl. ¶ 16.)

On February 7, 2006, Pudney summoned Del Rosario to his office. A coworker had earlier confronted Del Rosario about an accusation that, during a ceremony honoring a heroic volunteer fire fighter, she had refused to applaud. She denied the accusation and characterized it as a rumor. Pudney was angry that she had denied the accusation, and that she had characterized it as a rumor. Pudney instructed her that if she characterized the accusation as a rumor again he would write her up for insubordination. At the conclusion of the meeting, Del Rosario's lieutenant told her to watch her back, that the chiefs are watching her, and that he would hate for anything to happen to her. (Del Rosario Decl. ¶¶ 17-18.)

---

[11] Depositions had occurred in the FLSA case in December of 2005 and January of 2006. (Del Rosario Decl. ¶ 12.)

In the summer of 2006, Gordon seconded a motion to expel Del Rosario from the Volunteer Association because of her membership in the IAFF. (Gordon Dep. 92-94.)  On June 27, 2006, Del Rosario was assigned duty of cleaning, drying, and waxing two vehicles. The following shift she was assigned to clean, dry, and wax another vehicle even though crews are rarely or never assigned the duty of cleaning and waxing more than their own vehicle.  (Del Rosario Decl. ¶ 21.)  In fact, an assignment to wash and wax even one vehicle is unusual. (McDearmid Dep. 42-43, Oct. 6, 2006.)  Gordon could not recall any other specific instances where a paramedic was assigned to wash and wax a vehicle other than the rescue unit to which he or she had been assigned. (Gordon Dep. 101.)  Del Rosario overheard the orders conveyed to her lieutenant that specifically instructed that she be the one to do the work.  (Del Rosario Decl. ¶ 22.)

Del Rosario was ordered by the Chiefs not to participate in a function commemorating the service of a recently-deceased fire fighter, and to remain outside the station during the service. She was also ordered by her lieutenant to remain in the bunk room when volunteer fire fighters met in her station. (Gordon Tr. 104-06; Neil Nesmith Tr. 64-65, Oct. 4, 2006.)

According to Del Rosario, on January 9, 2007, Harris and Gordon said that an employee had claimed that Del Rosario's "New Year's resolution was to screw the department" and "everyone at the meeting could see that they were both talking about [Del Rosario]."   Gordon looked in Del Rosario's direction when he said that "this person" wanted to "f— the department." Harris also implied that Del Rosario had sabotaged City equipment. (Del Rosario ¶ 26.)

*Jeffrey Poole*

Jeffrey Poole was employed as a city paramedic and lieutenant from 1996 through

December 19, 2005, when he was terminated. (Poole Decl. ¶ 1.)  Poole is President of Local 4430.

(Poole Decl. ¶ 2.) According to Defendants, Poole was terminated based on his violation of

Plantation Fire Department Policy 84-3, his violation of the Department's Secondary Employment

Policy, his dishonesty during his Job Description Committee Hearing and his disregard of an order

to cease working as a real estate agent.

Defendants claim that Poole violated Plantation Fire Department Policy 84-3 entitled

Release of Information which states, in part, "no personal information pertaining to members shall

be disclosed, i.e. home address, telephone numbers, employment history, etc., without permission

from the Fire Chief or his designee, and in accordance with state law." (Plantation Fire Department

Policy 84-3, Def. A.23.)  Poole copied home addresses from rosters posted within the confines of

the fire stations, and furnished them to a real estate company, Balisteri Realty, in order that he

could solicit real estate business. (Testimony from Poole Predetermination Hearing at 9-11, A.24;

Poole Job Description Committee Hearing at 11-12, 42, A.25; Fact Finding Memorandum at 4,

A.26; Poole Dep. 55-56.)   During the Predetermination Hearing, Poole admitted the violation but

stated that he did not "intentionally violate the policy," although he acknowledged that it was "not

an excuse." (Predetermination Hearing at 9.)

Defendants also claim that Poole violated the secondary employment policy with respect to

his work as a real estate agent. In 2005, Poole left his position with Balistreri Realty and became

associated with Assist-to-Sell Realty.  (Poole Dep. 47-49.)  Poole did not inform the City of this

change.[12] (Poole Dep. 49-50.)  While investigating Poole's violations of the Secondary

_____

[12] According to Poole, he understood the purpose of the policy "to make sure there's no
conflicts with you being at your primary job or being available to your primary job." (Poole Dep.
50.)  Poole did not inform the City because neither his job description nor his off-duty activities

Employment Policy, Harris also discovered that Poole had formed two corporations, neither of which were disclosed to the City. (Harris Dep. 195.)

At some point, Harris discovered that Poole was no longer associated with Assist-to-Sell and had not notified the Department. (Harris Dep. 195-97.)  During the summer of 2005, Poole informed the City, with a change in employment form, that he had left Assist-to-Sell and was now associated with Enterprise Reality.  Poole provided that notification because he was being investigated for his role in disclosing the personal addresses of City firefighters and paramedics. (Poole. Dep. 51.)  Poole points out that although his realty broker changed, there was no change to his employment as a real estate agent, as he was an independent contractor. (Poole Decl. ¶ 11.)  On August 3, 2005, Harris and Gordon denied Poole permission to work his real estate job, due to the pending criminal investigation of him regarding the union letter. (Poole Decl. ¶ 11.)

Poole grieved the denial of his secondary employment the same day.  Gordon responded the next day by asking Poole to provide reasons for his appeal "in writing" and Poole responded with a statement of his reasons that same day. He received a reply from Gordon on August 8 informing that the grievance could not be conducted via email and Poole then submitted his grievance on paper that day.[13] (Emails between Harris and Poole, Pl. Ex. N; Poole Decl. ¶ 12.)  On September 14, 2005, Harris conducted a 10-minute hearing regarding his previous rescinding of Poole's

---

changed. (Poole Dep. 50.)  Poole did not make any money when he was associated with Assist-to-Sell. (Poole Job Description Committee Hearing at 61.) At his Job Description Committee Hearing, Poole noted that he mistakenly told Pudney at a previous hearing that he had made money at Assist-to-Sell. (Poole Job Description Committee Hearing at 61.)  Defendants point to this inconsistency as an additional ground for termination.

[13] Gordon was Poole's direct supervisor but Poole did not have a sense about Gordon's specific involvement in each of the actions that culminated in Poole's termination. (Poole Dep. 32-35.)

secondary employment and decided to deny Poole's employment request. Poole appealed this denial to Pudney. (Poole Decl. ¶13; Sept. 23, 2005 Letter from Poole to Pudney, Pl. Ex. O.)

Pudney rejected Poole's secondary employment request and Harris directed him not to engage in his real estate business while the investigation was ongoing.  (Poole Dep. 57.)  Even after the State Attorneys' Office dropped the investigation into Poole, Poole was not permitted to continue his secondary employment. (Poole Decl. ¶ 13.)   Poole continued to conduct real estate business because he "didn't agree with [Harris'] order to stop working with Enterprise Realty" and thought the order was "politically motivated and retaliatory." (Poole Dep. 58.)  The Department learned Poole was still working as a real estate agent when Johnson heard a voice message on Poole's cellular phone which identified him as working for Enterprise. (Harris Dep. 202.)  Poole explained during his November 2006 Predetermination Hearing that he had financial and professional obligations to meet in his secondary job and he felt he was at risk of losing his job with the City. (Job Description Committee Hearing at 59.)

Although other Division employees work as realtors, the department has never investigated them to determine if they have changed realtors, or if they have holding companies for tax purposes. Harris learned of Poole's private holdings through his own investigation of Poole's finances.  (Harris Dep. 65-66, 199-200.)  Another employee, Carlos Guzman, created a holding corporation and was not investigated or disciplined, but merely had permission to continue to use the corporation denied. (Harris Dep. 203-06.)

Pudney testified that he lost trust in Poole based on Poole's statements regarding his businesses and secondary employment, his disclosure of department information and statements by Poole that Pudney believed were inconsistent. (Job Description Committee Hearing at 50-57.)

On September 30, 2005, Harris issued a fact finding proceeding memorandum that discussed Poole's secondary employment history.  The memorandum contained Harris' recommendation that Poole be terminated for insubordination, for conduct unbecoming of an officer and for violation of the City's policy on the release of information and secondary employment. (Fact Finding memorandum, Def. A.26.)  After a hearing, Pudney terminated Poole. (December 20, 2005 Letter from Poole to McKenica, Pl. Ex. P.)

Poole appealed his termination to City Personnel Director, John McKenica, who reviewed a transcript of the predetermination hearing and then conducted yet another hearing on February 8, 2006.  McKenica sustained the dismissal. (December 20, 2005 Letter from Poole to McKenica, Pl. Ex. P; Memorandum to Poole from McKenica dated February 18, 2006, Def. A.29/Pl. Ex. Q.)  A written denial of the appeal was received on February 18, 2006. Poole immediately appealed the denial to the Job Description Committee. The hearing of the Job Description Committee occurred November of 2006.[14] (Poole Decl. ¶ ¶ 15-16; Memorandum to Poole from McKenica dated February 18, 2006, Def. A.29/Pl. Ex. Q; February 20, 2006 Letter from Poole to Job Description Committee, Ex. R.)

*Thomas Neri*

Thomas Neri was employed as a Lieutenant Paramedic by the City of Plantation until he was terminated by Pudney on July 13, 2005.  Neri is the Treasurer of the union. (Neri Dep. 24.)

In 2003, Diaz was placed under Neri's supervision.  When Harris informed Neri of the

---

[14] Defendants do not provide a record citation for the fact that the Committee concurred with Pudney's decision to terminate Poole and Plaintiffs do not admit these facts, which are contained in Defendants' paragraph 107.  Defendants do provide the transcript of the hearing in which the Committee upheld Pudney's decision.

personnel change, he instructed Neri to watch Diaz closely and "write him up."  Diaz had been instrumental in the previous union organizing campaign (Neri Dep. 90-92.)  Despite Harris' demand, Neri did not "write up" Diaz or recommend any discipline against Diaz during Diaz's service under his command because Diaz did not engage in misconduct and performed his job well. (Neri Decl. ¶¶ 2-3.)

Neri was reprimanded and suspended for giving conflicting statements to Pudney during a predetermination hearing, which arose from Neri's misconduct during a call for service on June 6, 2003. The June 6, 2003 situation arose when Neri's unit did not respond to a call for service involving a person who had chest pains. Given the non-response, another lieutenant picked up the call and contacted Neri during which time Neri advised that he would take the call. It was determined following a formal inquiry that Neri's crew was "extremely late in reacting to the notification," in part because Neri was extremely tired following a drive back from North Carolina. (Formal Inquiry of Neri, Def. A.16.)

Prior to August of 2004, Neri had received positive evaluations. In August 2004, Harris approached Neri while on duty and asked if he had heard any pro-union news in the department. Neri responded that he had not heard anything beyond "the usual, every once in a while" comment and added that "the last time the union [talk] came around we got our twenty-four shifts." Harris glared back at Neri with a real angry look, then abruptly walked to his car and drove away. (Neri Dep. 21-22; Neri Decl. ¶ 4.)  Shortly thereafter, Neri received a failing evaluation. (Neri Decl. ¶ 5.)

In December of 2004, there was an incident when someone coughed blood into the face of an EMT worker and the proper paperwork was not filled out nor was the battalion chief notified. (Neri Dep. 72.)  Neri was questioned about that incident. (Neri Dep. 65.)

Neri's battalion chief Johnson gave Neri an unsatisfactory evaluation for the period of October 1, 2004 through April 1, 2005.[15] (Neri's unsatisfactory evaluation dated October 1, 2004 through April 1, 2005, Def. A.32). On October 13, 2004, Neri received a memorandum from Johnson advising him that he did not meet the standards set by the department for a Rescue Lieutenant.[16] Neri received two negative employment evaluations in late 2004 and in 2005. (Neri Decl. ¶ 5.)

On May 1, 2005, Pudney wrote a memorandum to file regarding Neri's poor performance evaluation. Pudney provided Neri with 30 days to improve and further provided him with a list of areas to address. (Memorandum to Neri from Pudney dated May 1, 2005, Def. A.33.) Neri was ordered to suspend his "Crew Chief" training of paramedic Devon Anderson immediately so that he could concentrate on his own deficiencies. (Harris Dep. 45.) Neri continued the training of Anderson on the very next shift. (Harris Dep. 45, 168-71.) . Neri claims that he did so because he "completely forgot" and because his mind was "so boggled." (Neri Dep. 80-81.)

Anderson complained to Administration about Neri because Neri required Anderson to enter reports immediately, but failed to do so himself. (Harris Dep. 166.) Neri told Harris that he refused to write his reports immediately upon return to the station because he preferred to enter information on those service runs in the morning when he "felt fresher" or wait until he made "something to eat and relax a little bit" (Harris Dep. 165; Neri Dep. 83-84.)

On June 13, 2005, a pre-determination hearing was held with Pudney, during which time

---

[15] Gordon was not Neri's battalion chief and they did not interact often. (Neri Dep. 43.)

[16] The record citations provided do not support this assertion but Plaintiffs admit this. The facts stated in Paragraph 110 are not supported by the record citations provided and denied by Plaintiff.

Neri admitted that he failed to enter his reports immediately upon his return to the station, and that

he engaged in crew chief training of Anderson after being ordered not to do so.  Pudney terminated

Neri for disobeying direct orders, insubordination and for failure to again meet minimum

performance standards.(June 13, 2005 Final Determination of Neri by Pudney, Pl. Ex. M.) Neri

never appealed his termination to either the Personnel Director or the Job Description Committee

pursuant to City Charter.[17]

### Suzette Terheun

Suzette Terheun is a former Lieutenant Paramedic who resigned from her employment with

the City in March of 2006 based on health reasons. At the time of her resignation, and continuing

up until the time of her deposition on June 20, 2006, Terheun was not medically cleared to work by

her doctors because of neck and back injuries.[18] (Terheun Dep.5-7; Terheun Decl. ¶ 1.)

On April 18, 2005, Terheun and her crew missed a call to a home that came in through 911.

Terheun was asleep and failed to respond to the alarm. After a delay, another rescue unit,

supervised by Lieutenant Alanez, picked up the call and proceeded to the residence. Terheun

learned of the call when Alanez called her on her Nextel cellular phone. (Terheun Decl. ¶ 2.)

Terheun then radioed dispatch to confirm that she would take the call and was on the road within

seconds of Alanez's call. (Terheun Decl. ¶ 4.)  At the time, the other two members of Terheun's

crew were asleep in the day room. (Formal Inquiry regarding Suzette Terheun, Def. A.17; Terheun

---

[17] No record citation for this fact was  provided by Defendants but Plaintiffs admit this
fact.

[18] Terheun's issue in this case is with Pudney's decision to suspend her for 40
hours after she violated several policies during an April 18, 2005 call, and the City's decision
to deny her disability retirement benefits for an injury that she sustained off-duty when she
slammed her head into a car door frame. (Amended Complaint ¶ ¶ 38, 47; Terheun Dep. 67-68.)

Dep. 10.)

While en route to the call, Terheun looked for the address in her map book.  In searching

the map, she could not find an 18th Street address and could find only a 18th Court address.

(Terheun Dep.14; Terheun Decl. ¶ ¶ 5-6.)  Terheun radioed dispatch and asked for the name of the

development from which the call had been placed. (Terhuen Dep. 16.)  Going to the 18th Court

address required entering a gated development, and that required waiting for the gate to be opened.

As Terheun's truck was arriving at the 18th Court address, a dispatcher then contacted Terheun

using a Nextel to tell her that the porch light at the location should be on, but that a language

barrier was preventing dispatch from determining the development name. Teheun responded on the

Nextel that the porch light was off, but the dispatcher responded that it was the correct address.

Terheun's crew knocked on the door and determined it was not the correct address. Terheun

radioed dispatch to ask again about the name of the development. A dispatcher then radioed back,

saying that they had looked on their map and had found that it was in the Jacaranda Lakes

development. Terheun then ordered her crew to the correct address.[19]  The patient, who was

suffering from stomach pains, was not adversely affected by the delay.  (Terheun Decl. ¶ ¶ 5-8.)

At 7:00 a.m., Terheun entered her report into the computer system at the station and called

dispatch to verify the correct times to put in the report.  Her report stated that her arrival time was

4:09 a.m., which was the arrival time at the wrong address, and the report stated that the dispatcher

had given her the wrong location. (Terheun Decl. ¶ 9; Formal Inquiry of Terheun).

According to Harris, Terheun violated procedures by using the Nextel cellular phone

_____

[19] It took Terheun 22 minutes to arrive at the correct address whereas the general response
time to arrive at emergencies is generally six minutes. (Gordon Dep. 149; Pudney Dep. 148.)

instead of the radio, which serves to record all communication. (Harris Dep. 213.)  According to

Plantation Fire Department Policy #2002-02, cell phone use for dispatching purposes is limited to

situations in which there is a "major communication breakdown." The policy further states that

"radio cell phones shall not be used to replace normal radio communications. Members shall not

use the phones for operational issues while in the course of responding to incidents." (City of

Plantation Fire Department Policy #2002-02, Def. A.38.)  Terheun notes that both rescue and

dispatch personnel use the Nextel cellular phone during operations. (Terheun Decl. ¶ 3.)

Gordon asked Terheun about the call on her next shift. Later that day, Gordon summoned

Terheun to his office, where he and Johnson questioned her about the call. Gordon accused her of

lying about the call. On the accusation of lying, Terheun requested union representation and

Gordon angrily denied it. Gordon then said that Teheun would be going through a fact-finding with

Harris, and ordered her to follow him to Harris' office. Harris questioned her about the call, and

then summoned Diaz and Del Rosario to question them as well. At the conclusion of the

factfinding, Harris said that Terheun was going to get "the whole enchilada."  (Terheun Decl. ¶

9-12.)  Terheun again requested union representation and was refused.  When she protested, Harris

became angry and said, "You will answer everything I ask you. ... By saying that you are a union

[sic] and entitled to that [representation], that is a violation because you're not [sic].... So don't be

spreading rumors out there."[20]  (Harris Dep 218-19.)  Harris told her that her requests for union

representation were in violation of "PERC law" and added that "you know how the City feels

about the union." (Gordon Dep. 150.)

_____

[20] Since there was never a vote with respect to unionization, there is no certified
bargaining representative for the employees of the City. (Gordon Dep. 67.)

No Division employee other than Terheun has been disciplined in any way for violating the telephone procedure. (Harris Dep. 213, Teheun Decl. ¶ 15.)  Other employees have used Nextel phones during operational calls, but none, other than Terheun, have been investigated or disciplined for it. (McDearmid Dep. 37-39, 64-65.)  Some lieutenants have entirely missed calls and have not been investigated or disciplined. (McDearmid Dep. 39-41.)

Gordon recommended to Pudney that Terheun receive a short term suspension and Harris' disciplinary recommendation for Terheun was a 2-shift suspension.[21] (Formal Inquiry regarding Suzette Terheun, Def. A.17; Gordon Dep. 151.)  Terheun did not appeal her 40-hour suspension to the Personnel Director pursuant to City Charter.[22]

In early June of 2005, Terheun requested disability leave because of a neck injury. (Terheun Decl. ¶ 16.)  On June 20, 2005 at a shift meeting, Harris responded to a question about disability benefits, by stating that he did not understand why employees would jeopardize their disability leave by joining as plaintiffs in the FLSA suit. (Diaz Decl. ¶ 9.)

On September 1, 2005, Terheun applied for disability retirement. Her hearing took place on September 14 and she was informed the next day that it was denied. She filed an appeal on September 23, 2005.  (Terheun Decl. ¶ 17.)   The City of Plantation has refused to pay Terheun for the pay period ending September 29, 2005.  (Terheun Decl. ¶ 18.)  In 2006, Harris told Diaz he would make sure Terheun got her disability retirement if the plaintiffs settled the FLSA lawsuit.

---

[21] Defendants claim that Pudney reviewed Harris' decision and reduced her suspension to a 40-hour suspension. Defendants provide no record cite and Plaintiffs deny this fact, thus the Court finds there is no identified record evidence for the Court to consider regarding Pudney's suspension of Terheun.

[22] Plaintiffs admit Defendants' Paragraph 127.

(Diaz Dep. 56.)

II.  Summary Judgment Standard

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  According to the plain language of  Fed. R. Civ. P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. Anderson, 477 U.S. at 257. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." Anderson, 477 U.S. 242, 249-50.

III. Discussion

A. Retaliation Claims

To establish retaliation for engaging in constitutionally protected activity in violation of 42 U.S.C. § 1983, a public employee must show that 1) he or she was speaking as a citizen on a matter of public concern; 2) his or her interests as a citizen outweighed the interests of the State as an employer and 3) the speech played a substantial or motivating role in the adverse employment action. Vila v. Padron, 484 F.3d 1334, 1339 (11th Cir. 2007).[23] The fact finder determines whether the speech played a substantial or motivating role in the adverse employment action. Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989). If these three elements are established, the burden shifts to the defendant to show that it would have reached the same decision even in the absence of the protected speech. Id. at 1566; see Akins v. Fulton County, 420 F.3d 1293, 1303 (11th

---

[23] In reliance on Sixth Circuit law, Defendants urge this Court to find that Plaintiffs must show that the adverse employment action was "motivated in substantial part by the plaintiff's constitutional protected activity." (Def. Mot. 5; Def. Reply 10.) Although the Court is unclear how this proposed standard would differ from the standard set forth in Vila, the Court will apply the most recent Eleventh Circuit law to the facts of this case.

Cir. 2005).[24]

A prima facie case of retaliation under the FLSA requires the following: 1) Plaintiffs must have engaged in activity protected under the act; 2) Plaintiffs suffered adverse action by the employer and 3) a causal connection existed between the employee's activity and the adverse act. Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-43 (11th Cir. 2000). "In demonstrating causation under the FLSA, [a] plaintiff must prove the adverse action would not have been taken 'but for' the assertion of FLSA rights." Id. quoting Reich v. Davis, 50 F.3d 962, 965-66 (11th Cir. 1995). "The 'motivating factor test' is equivalent to a 'but for' standard." Reich, 50 F.3d at 966.

In determining the scope of what constitutes an adverse act, a recent United States Supreme Court decision, Burlington Northern & Santa Fe Railway Co., v. White, 548 U.S. 53 (2006), held in a Title VII action that the application of that statute's retaliation provision is not limited to actions by employers that affect the terms, conditions or status of employment, or even those acts that occur at the workplace. Burlington Northern, 548 U.S. at 62-64. Instead, the anti-retaliation provision covers those employer actions that would be seen as materially adverse to a reasonable employee or, in other words, would serve to dissuade a reasonable employee from bringing a charge of discrimination. Id. at 68. Furthermore, because the significance of any act must be viewed in the appropriate context, the "legal standard speaks in general terms rather than specific prohibited acts." Id. at 69. By way of example, Burlington Northern noted that "[a] schedule

---

[24] Defendants concede for purposes of this motion that Poole, Neri and Terheun suffered adverse employment actions, but seek a ruling from this Court that their speech did not play a substantial or motivating role in the adverse employment action. As for the other Plaintiffs, Defendants argue that they did not suffer any adverse employment actions and thus do not address the causation issue for those Plaintiffs. Defendants do not seek summary judgment with respect to the remaining elements of the First Amendment or FLSA claim.

change in an employee's work schedule may make little difference to many workers, but may

matter enormously to a young mother with school age children." Id.

The Eleventh Circuit has regularly observed that the adverse employment act requirement

of Title VII and First Amendment retaliation claims are consonant. Akins, 420 F.3d at 1301 n.2;

Stavropoulous v. Firestone, 361 F.3d 610, 619 (11th Cir. 2004).   Thus, the Court finds that the

Burlington Northern standard should be applied to Plaintiffs' First Amendment claims. See Zelnik

v. Fashion Inst. of Tech., 464 F.3d 217, 227 (2d Cir. 2006) (applying the Burlington Northern

standard to First Amendment claims).  Likewise, the Court also finds that the Burlington Northern

standard applies to FLSA retaliation cases as well.  Notably, the retaliation provision of the FLSA

uses nearly identical language to that of Title VII.  Compare Title VII ("It shall be unlawful

employment practice for an employer to discriminate against any of his employees ... because he

has opposed any practice made an unlawful employment practice by this subchapter, or because he

has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding,

or hearing under this subchapter.") with the FLSA ("[I]t shall be unlawful for any person ... to

discharge or in any other manner discriminate against any employee because such employee has

filed any complaint or instituted or caused to be instituted any proceeding under or related to this

chapter, or has testified or is about to testify in any such proceeding, or has served or is about to

serve on an industry committee.") Indeed, the Tenth Circuit recently held that the Burlington

Northern standard should be applied to various federal statutes with similarly worded retaliation

provisions. See Metzler v. Federal Home Loan Bank of Topeka, 464 F.3d 1164, 1171 n.2 (10th Cir.

41

2006) (extending <u>Burlington Northern</u> to ADEA, ADA and FMLA claims).[25]

Next, with respect to causation for a First Amendment retaliation claim, the Eleventh Circuit has stated that a plaintiff's burden at this stage is "not a heavy one" and one factor that can be considered is the timing of the termination or other adverse employment act. <u>Stanley v. City of Dalton</u>, 219 F.3d 1280, 1291 and n.20 (11th Cir. 2000).[26]  Put another way, a reasonable inference can be drawn that the protected speech was the cause of the adverse employment decision when the termination closely follows the protected activity.  <u>Id.</u>  In addition, the Court may consider circumstantial evidence of causation including who initiated internal investigations or termination proceedings, evidence of management hostility to the speech in question and motive by the employer to retaliate.  <u>Id.</u>  Other factors for consideration include whether any comments made or actions taken by the employer indicate the discharge was related to the protected speech. <u>Id.</u>

The United States Supreme Court decision in <u>Mt. Healthy City School Dist. Bd. of Education v. Doyle</u>, 429 U.S. 274 (1977) provides guidance regarding a defendant's burden under the fourth prong.  <u>See Bryson</u>, 888 F.2d at 1565-66.  In <u>Mt. Healthy</u>, the Supreme Court held that "once a plaintiff shows that his constitutionally protected speech was a substantial or motivating factor in his adverse treatment by his employer,  the employer should be given an opportunity to show by a preponderance of the evidence that it would have reached the same decision as to the

---

[25] Defendants disagree with the application to <u>Burlington Northern </u>outside of the Title VII context. However, they provide no persuasive legal basis for this argument.  Although there are no reported Eleventh Circuit cases on this issue, the Court believes that its analysis is the correct one.  <u>See</u>, <u>e.g.</u>, <u>Brown v. Northside Hosp.</u>, 311 Fed. Appx. 217, 224 (11th Cir. 2009) (applying <u>Burlington</u> to an ADEA retaliation claim).

[26] Given that both First Amendment and FLSA retaliation cases apply the "motivating factor test," <u>Stanley</u> is equally applicable to these claims.

plaintiff even in the absence of the protected conduct."  Stanley, 219 F.3d at 1292-93 quoting Mt. Healthy, 429 U.S. at 287 (internal quotation marks omitted).  An employer must show that "the legitimate reason would have motivated it to make the same employment decision" by showing with "a preponderance of the evidence, that, in light of its knowledge, perceptions, and policies at the time of the termination, it would have terminated the employment regardless of the protected speech." Id.

With these principles in mind, the Court will address some of Plaintiffs' claims.[27]

### 1)  Poole

Defendants concede for the purposes of summary judgment that Poole's termination subjected him to an adverse employment action.  Defendants argue, however, that Poole cannot establish that the exercise of his first amendment rights was a substantial or motivating factor for any adverse employment action, a requirement for a prima facie case. Starling v. Board of County Commissioners, ___ F.3d ___, 2010 WL 1294054 at *2 n.1 (11th Cir. 2010); see (Def. Mot. 19-20.)  In addition, Defendants argue that even if Poole could establish a prima facie case of retaliation, Defendants would have taken the same actions absent Poole's involvement with the union or the FLSA lawsuit because he "disobeyed lawful orders given by supervisors with full understanding of the orders" and "violated multiple departmental policies." (Def. Mot. 21-23.)

In response, Poole contends that the various comments made by City officials regarding unionization and the time line that shows retaliation came immediately after the filing of the PERC petition and FLSA lawsuit is adequate proof of causation.  Poole also asserts that Defendants have

---

[27] Given the delay in issuing this Order, the instant order will only address Poole's retaliation claims. The Court will enter order(s) regarding the remaining plaintiffs claims in due course.

no reasonable basis upon which to rest their discharge. (Pl. Resp. 24.)

The Court finds that Poole has provided adequate record evidence to defeat summary judgment on the issue of causation.  With respect to temporal proximity, Plaintiffs filed the PERC petition in March of 2005 and several Plaintiffs, including Poole, co-authored a letter that same month addressing the effect of unionization on the Fire Department.  On May 9, 2005, Plaintiffs filed the FLSA lawsuit. In May of 2005, Poole was brought to a police station by Harris and Gordon to be interrogated regarding sending the union letter. On August 3, 2005, Harris and Gordon denied Poole permission to work his secondary job and the formal process to terminate Poole began on September 30, 2005 when Harris recommended to Pudney to terminate Poole.  The short time gaps between these events is evidence for a reasonable jury to conclude that protected speech was a substantial factor in the decision to terminate Poole. Beckwith v. City of Daytona Beach Shores, Fla., 58 F.3d 1554, 1566-67 (11th Cir. 1995) (no per se rule as to length of time necessary to create inference but five month gap between speech and initial discipline and twelve month gap between speech and start of termination process creates factual question for jury).

Given Harris' involvement in the investigations of Poole as well as Harris and Pudney's involvement in Poole's termination, their comments regarding unionization and the FLSA lawsuit are probative.  In front of an on-duty crew, Harris told Poole that the FLSA suit was frivolous and that the people involved in that suit would be marched out of the courtrooms in handcuffs for lying in depositions. (Gordon Dep. 48-49; Johnson Dep. 37-38; Poole Decl. ¶ 6.)  At another meeting, Harris called the plaintiffs in the FLSA lawsuit "cowards." (Gordon Dep. 62; Reed Dep. 252-57.) Pudney stated that he would fight the "SOBs" who brought the FLSA suit. (Del Rosario Decl. ¶ 24.)  Harris referred to union employees as "children" who he put on the "leper shift." (Reed Dep.

44

28-29.)   A jury could find that these comments reflect hostility to Poole's pro-union speech and the FLSA lawsuit.[28]

Given the close temporal proximity as well as these highlighted comments by Harris and Pudney, there is adequate evidence for the jury to find that Poole's union activity and filing of the FLSA lawsuit was a substantial or motivating factor for his termination.

Turning to the fourth prong, Defendants argue that Poole would have been terminated absent his involvement in the union or the FLSA lawsuit.  In support, Defendants point to Poole's continued work as a real estate agent after having been ordered to stop working as an agent, his failure to inform the City of changes to his secondary employment and Poole's admission that he violated the City's policy on the release of information when he furnished home addresses to a real estate company. (Def. Mot. 12-13.)

In response, Poole states that the order to cease his outside employment was not lawful and that he did not violate City policy when he changed real estate agencies.  With respect to the Poole's violation of the policy on the release of departmental information, Poole does not deny that he violated the policy. [29]

---

[28] Defendants argue that any anti-union statements they made would fall under First Amendment protection.  (Def. Reply 11.)  To be sure, the First Amendment and  section 8(c) of the National Labor Relations Act, permit employers to express preference regarding unionization as long as "such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(a)(1).  Without reaching the question, the Court simply notes that these particular comments could be construed to contain threats as opposed to mere expression.

[29] Harris' fact finding memo recommends that Poole be terminated for the following reasons: 1) violation of the release of department information when he provided that information to Balistreri Realty and when he used that information to send out the March 2005 union letter; 2) violation of the secondary employment policy; 3) insubordination and 4) conduct unbecoming an officer. (Fact finding memorandum, Def. A.26.)  Defendants state that Pudney "sustained

To determine whether Defendants have met their burden, the Court begins by examining the facts surrounding Poole's continuation of his secondary employment, after having been told to cease his employment while he was under investigation.  The Court finds that Defendants' proffered reason raises a question of fact as to whether Poole would have been terminated in the absence of his union and FLSA activity.  Poole's violation of the order to cease secondary employment cannot be analyzed in a vacuum.  Viewing the facts in the light most favorable to Poole, Defendants ordered Poole to cease his secondary employment because of the ongoing criminal investigation into his use of the names and addresses of employees for the purpose of distributing the union letter.  But Gordon and Harris instigated that investigation and were responsible for reporting Poole to the police.  A jury could find that Defendants concocted a bogus investigation which they later used to prohibit Poole's secondary employment. As such, the Court finds that a jury could conclude that Poole was not terminated because he violated the order to cease secondary employment, but instead was retaliated against for his protected speech.

The same can be said for Defendants' proffered reason that Poole's termination was proper due to his failure to notify the City of changes in his secondary employment.  There is no dispute that the City had previously approved Poole's secondary employment as a realtor.  Therefore, the gravamen of the City's complaint is that Poole changed realty agencies without informing the City.  The City's policy, however, only requires notice from an employee when a "major change" occurs in secondary employment.  But here, Poole notes that he worked as an independent contractor and

---

three out of the four charges against Poole and terminated his employment" and did not find a policy violation with respect to Poole's use of the names and addresses for the union letter. (Def. Statement of Facts ¶ 106 and n.3.)  Defendants did not provide a record citation for Pudney's decision.

there was no major change when he switched realtor firms, but merely a technical change. Poole also points out that, although other employees work as realtors, there have no investigations to determine if they ever changed realtor firms. Based on this record, a jury could find that the violation of the secondary employment policy was nothing more than a subterfuge and that the City used Poole's change of realtor firms as an excuse to retaliate against him for his protected speech.

Poole's admitted violation of the policy regarding the release of department information is the final issue for consideration. In examining Defendants' evidence under the Mt. Healthy doctrine, the Court must apply a "case by case," "fact intensive approach." Id. at 1293-94. Applying this doctrine in Stanley, the Eleventh Circuit found a factual question when a police officer was terminated in part for polygraph results showing deception. Although deceptive polygraph results could, standing alone, support termination, the Stanley Court found that the deceptive answers concerned less significant topics, such as the plaintiff's use of profanity as opposed to criminal activity, that did not require a finding, as a matter of law, that termination was required. Id. at 1294. Based on Stanley, this Court finds that there is a jury question on that same basis. Here, Defendants have produced no evidence that violation of this policy must result in termination as opposed to other forms of discipline. The Court cannot find, as a matter of law, that Poole's release of department information, and not his protected speech, was the motivating factor behind his termination. Lastly, given that a jury could find that the other proffered reasons were flimsy applications of City policy, a jury could find that the Defendants' use of this admitted violation of City policy is tainted by the entirety of the circumstances outlined above.

B.  Municipal Liability[30]

With respect to municipal liability, the City asserts that "Plaintiffs have failed to establish a custom or policy as required to establish municipal liability under 42 U.S.C. § 1983." (Def. Mot. 25.)  The City argues that, in deciding the liability of the City, the "dispositive issue" is whether Pudney, Harris and Gordon are final policymakers with respect to employment terminations and discipline at the fire department. (Def. Mot. at 26.)  According to the City, because the disciplinary decisions are subject to meaningful administrative review by the Job Description Committee, none of the individual Defendants are final policymakers for the purpose of section 1983 liability. According to the City, the Committee only took action with respect to Poole and that action was neither retaliatory nor a rubber stamp for Pudney.

Plaintiffs' argument for municipal liability is two-fold.  Plaintiffs argue that Pudney is the final decision maker for the fire department and the Committee is nothing more than a rubber stamp for Pudney.[31]  Plaintiffs also point out that many of the actions taken by the Defendants against Plaintiffs were not disciplinary in nature and thus not subject to review by the Committee. Such actions included  assignment of menial tasks, denial of shift swaps and ordering a criminal investigation. Secondly, Plaintiffs claim that the City had a custom to harass, intimidate and retaliate against any employee engaged in union organizing or FLSA activity.

It is a well-settled principle that a municipality or county cannot be held liable under section 1983 for the acts of its employees on a theory of respondent superior. Scala v. City of

[30] The ruling on municipal liability assumes that all of Plaintiffs' retaliation claims can proceed.

[31] In the alternative, Plaintiffs argue a jury could find that the Committee had to retaliate "unofficially . . .  to avoid liability or public reaction." (Pl. Resp. 32-33.)

Winter Park, 116 F.3d 1396, 1399 (11ᵗʰ Cir. 1997) citing Monell v. Department of Social Services

of the City of New York, 436 U.S. 658 (1978).  The City may only be held liable for the execution

of an official government policy or custom.  Quinn v. Monroe County, 330 F.3d 1320, 1325 (11ᵗʰ

Cir. 2003); Scala, 116 F.3d at 1399.  For an official to have policymaking authority, his or her

decisions must be final and not subject to review. Scala, 116 F.3d at 1399. "An official or entity

may be a final policymaker with respect to some actions but not others." McMillian v. Johnson, 88

F.3d 1573, 1578 (11ᵗʰ Cir. 1996).   Final policymaking authority over a particular subject area does

not vest in an official whose decisions in the area are subject to meaningful administrative review.

Scala, 116 F.3d at 1401.  Of course, review is not meaningful if the reviewing body acts as nothing

more than a rubber stamp. See Morro v. City of Birmingham, 117 F.3d 508, 514 (11ᵗʰ Cir. 1997)

(finding police chief was not final policymaker, but noting that reviewing board was not "merely a

rubber stamp for the [c]hief"); cf. Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11ᵗʰ Cir.

1999) (acknowledging that evidence of reviewing body acting as a "rubber stamp" or "cats paw"

could be used to prove discriminatory animus).  The question whether an official has final

authority to establish municipal policy is a question of law for the Court to decide. Jett v. Dallas

Indep. Sch. Dist., 491 U.S. 701, 737 (1989); Scala, 116 F.3d at 1398-99.

The Eleventh Circuit has cautioned district courts to distinguish between the "final

policymaker" and the "decisionmaker."  Quinn v. Monroe County, 330 F.3d at 1326-27.  "The

final policymaker inquiry addresses who takes actions that may cause the municipality . . . to be

held liable for a custom or policy [whereas] the decisionmaker inquiry addresses who has the

power to make official decisions and, thus, be held individually liable." Id. (internal quotations

omitted).  Authority is given to a decisionmaker by a rule or by statutory authority. Id. at 1328.

49

With respect to termination decisions, a decisionmaker possesses the ability to terminate an

employee without further review or with approval by higher authority and authority. Id.   If further

review is conducted by a committee, although not required to effectuate termination, the committee

would not be considered the decisionmaker, but the final policymaker. Id. 1327-28.

Given the record developed at this point in the proceeding, the Court finds that Pudney is

the final decisionmaker with respect to Poole and Neri's terminations.  The undisputed evidence

demonstrates that Pudney made the official decisions to terminate Poole (December 20, 2005

Letter from Poole to McKenica, Pl. Ex. P) and Neri (June 13, 2005 Final Determination of Neri by

Pudney, Pl. Ex. M).  These official acts by Pudney, however, subject Pudney to individual liability

but does not establish municipal liability, unless the evidence also shows that Pudney also acted as

final policymaker with respect to these terminations.[32]

With respect to Poole, the Court finds, as a matter of law, that the Committee, and not

Pudney, is the final policymaker with respect to Poole's termination. The City Charter provides a

method of review for disciplinary actions, such as terminations, which provides, as a final step,

review by the Committee. Poole sought and received this review of his termination.  Nonetheless,

Poole claims that the Committee was not the final policymaker because it acted as a rubber stamp

when it upheld Pudney's decision to terminate Poole.  To that end, Poole  points to sparse record

evidence; namely, that the Committee rarely met and little was known about it by city officials.

However, this is hardly an adequate basis to find, as a matter of law, that the Committee is an

_____

[32] Plaintiffs' response argues that Pudney is the final decisionmaker (Pl. Resp. 34).
However, Plaintiffs' arguments and caselaw support suggest that they also seek a ruling that
Pudney is also the final policymaker and Defendants provide argument against this finding. Thus,
the Court shall conduct this analysis.

ineffectual, sham process.  The mere fact that employees failed to take advantage of the Committee

does not render it a rubberstamp.

Moreover, Poole has not provided a basis to find that the Committee acted with a

retaliatory motive, and that is fatal to his claim.  In <u>Hill v. Clinton</u>, 74 F.3d 1150, 1152 (11th Cir.

1996), the Eleventh Circuit was presented with a similar situation.  Hill, a police officer, brought a

Section 1983 action against the City of Gainsville, alleging gender discrimination, equal protection

violations and retaliation arising from demotion.  <u>Hill</u>, 74 F.3d at 1151.  Hill argued the city

manager ratified the police chief's decision to demote her. However, the Court found that "even

assuming that [the police chief]'s actions were illegal because they were based on improper

motives, the city would not be liable because Hill has simply presented no evidence that [the city

manager] approved of <u>the basis</u> for the [the police chief]'s actions: the improper motives."  <u>Id.</u>

(emphasis in original)

Here, the only evidence presented by Poole of retaliatory motive by the Committee are

statements by the Mayor that she was not in favor of unionization. Those comments, standing

alone, do not reflect that the Mayor sought to retaliate against Poole for his union activities.

Moreover, Poole provides no evidence about the other members of the Committee.[33]  This is

particularly significant because if  the Committee acts as the final policymaker for the City, it can

only subject the City to liability if the majority of the Committee acted with an improper motive.

<u>Matthews v. Columbia County</u>, 294 F.3d 1294, 1297 (11th Cir. 2002) ("an unconstitutional motive

on the part of one member of a three-member majority is insufficient to impute an unconstitutional

---

[33] Defendants' statement of facts state that the Committee is comprised of the mayor and two council members, but they provide no citation to the record for this fact.

motive to the Commission as a whole").  Hence, the Court concludes that the Committee was the final policymaker for Poole's termination and the record does not support an inference that the Committee acted with a retaliatory motive. Accordingly, there is no municipal liability based on a policy with respect to Poole's termination.

This analysis impacts Neri's claim for municipal liability.  In determining whether Pudney is the final policymaker for Neri, the Court must examine whether there was an actual "opportunity" for "meaningful review" of Pudney's decision to terminate Neri.  Oladeinde v. City of Birmingham, 230 F.3d 1275, 1295 (11th Cir. 2000).  The Eleventh Circuit has found that when there is a "formal multi-step appellate process that was theoretically available on paper" but that could not, "as a practical matter," be taken advantage of, there is no opportunity for meaningful review.  Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1293 (11th Cir. 2004).  Although Neri did not seek review of his termination as provided to him by the City Charter, there is no evidence that Neri could not take advantage of the City Charter's appellate process. Thus, Neri had the opportunity for meaningful review of Pudney's decision by the final policymaker, the Committee, and there is no evidence that the Committee acted as a rubberstamp for Pudney.  Thus, no review of Neri's termination ever came before a final policymaker and the City cannot be held liable for Neri's termination.

With respect to the remaining Defendants, the Court reserves ruling on the identity of the final policymaker for the City. There is inadequate record evidence of Pudney's decision to uphold Gordon's recommendation that Terheun receive a suspension and, although there is evidence that Terheun appealed the City's denial of disability retirement, there is no evidence of the outcome of that appeal.  Thus, the Court cannot determine the identity of the final policymaker for Terheun.

Finally, there are numerous decisions that impacted the other named Plaintiffs, including Tribie, Kluver, Diaz and Del Rosario, that are not disciplinary in nature and thus not subject to review by the Committee.[34]  These acts, such as assignment of menial tasks, denial of shift swapping, denial of light duty and secondary employment, and the ordering of a criminal investigation, were allegedly perpetrated by Harris, Gordon, Johnson as well as other fire department supervisors.   The City Charter only addresses review of disciplinary decisions and Defendants do not identify final policymakers for these decisions and simply state that these Plaintiffs could have appealed these decisions to Pudney. (Def. Reply 17 n.5.)  Nor do Defendants address how the final policymaker analysis applies to Tribie and Kluver's claim that they were constructively discharged. The City Charter does not address a constructive discharge situation. Accordingly, the Court can only issue a ruling, as a matter of law, with respect to the municipal liability as it relates to these Plaintiffs.

Absent a decision by a policymaker, liability against a municipality may be based on custom and requires a plaintiff to establish "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991) (citations and quotations omitted).  Such a widespread practice is "deemed authorized by the policymaking officials because they must have known about it but failed to stop it."  Id. Moreover, "a municipality's failure to correct [ ] constitutionally offensive actions of its employees can rise to the level of a custom or policy if the municipality tacitly authorizes these actions or

---

[34] This would also apply to adverse employment acts, outside of termination, sustained by Poole and Neri.

displays deliberate indifference towards the misconduct." Griffin v. City of Opa-Locka, 261 F.3d

1295, 1308 (11th Cir. 2001) (internal quotation marks omitted).  However, [r]andom acts or

isolated incidents are insufficient to establish a custom." Church v. City of Huntsville, 30 F.3d

1332, 1345 (11th Cir. 1994).  If genuine issues of material fact exist regarding whether

constitutional deprivations were caused by a City custom exist, summary judgment is

inappropriate. Young v. City of Augusta, 59 F.3d 1160, 1173 (11th Cir. 1995).

      The Court finds there are genuine issues of material facts precluding a finding for

Defendants that the City does not have a custom of harassing, intimidating, and retaliating against

employees that are pro-union.  For example, a jury could find that Harris' statements that he would

move union supporters to shifts that would make them unhappy and Johnson's statements to her

subordinates that she would not swap shifts with union supporters to be evidence of this custom

(Diaz Dep. 26, 29-30, 61-62; Johnson Dep. 51-55.)  Likewise, the record evidence that leave (Diaz

Dep. 39-40), light duty (Del Rosario Decl. ¶ 3; documentation of light duty requests, (Pl. Ex. 6),

ability for overtime and swapping shifts (Del Rosario Dep. 26; Del Rosario Decl. ¶¶ 6, 8-9) was

denied to union supporters but not non-union employees raises a question of fact about the City's

custom.  The favorable treatment given to employees who left the union (Anderson Dep. 20-21)

and the lack of or disparate discipline for non-union employees in comparison to union employees

is further evidence on this point (Harris 62, 65, 204). Finally, Harris and Gordon's ordering of

Neri, Diaz and Poole to the police station for a criminal investigation for the publishing of a pro-

union letter (Diaz Dep. 36-37; Gordon Dep. 107; Harris Dep. 111-15; Diaz Decl. ¶ 7; Neri Decl. ¶

7, Poole Decl. ¶¶ 9-10) and Harris' obscene gestures directed to Diaz, which were mimicked by

several lieutenants, raise factual questions regarding the City's custom for a jury to consider (Diaz

54

Dep. 62.).

In response, Defendants contend that Plaintiffs have pointed to no evidence that Pudney or any other city official gave written or verbal directives that retaliatory actions be taken against Plaintiffs. Defendants state that even if Pudney made statements regarding his opposition to the union, those statements are protected by the First Amendment. The Court agrees that *some* of the comments that Plaintiffs take issue with, <u>e.g.</u>, Pudney and Gordon's concern that jobs could be in jeopardy if unionization occurred, are not retaliatory in nature. Comments such as these do, however, provide a backdrop to the events that occurred during the union drive. Surely an inference of a retaliatory motive can be drawn when such legitimate comments are coupled with other troubling statements and acts highlighted herein. In other words, the concerns from city officials regarding the impact of unionization cannot be viewed in isolation from the statements and acts that raise a jury question on retaliation.

       C. Qualified Immunity

       In addressing a claim of qualified immunity, the Court must first examine whether the facts presented, taken in a light most favorable to Plaintiffs, establish a constitutional violation. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). Second, the Court must then determine whether the right violated was "clearly established" such that "a reasonable official would understand that what he is doing violates that right." <u>Bashir v. Rockdale County, Ga.</u>, 445 F.3d 1323, 1327 (11th Cir. 2006) quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002).[35]  In examining the "clearly established" prong,

---

[35] The official asserting qualified immunity must first establish that he was performing a "discretionary function." <u>Crosby v. Monroe County</u>, 394 F.3d 1328, 1332 (11th Cir. 2004). The burden then shifts to the plaintiff to demonstrate qualified immunity is not appropriate. <u>Gray ex rel. Alexander v. Bostic</u>, 458 F.3d 1295, 1303 (11th Cir. 2006). Neither party contests that the individual Defendants were performing a discretionary function.

the Court's inquiry involves an examination into "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. quoting Saucier, 533 U.S. at 202. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 1330.  Notice to officials may be given by federal statute, federal constitutional provision, caselaw decisions of the United States Supreme Court, United States Court of Appeals for the Eleventh Circuit, and the Florida Supreme Court. Id. at 1331.

The Mt. Healthy doctrine comes into play in the qualified immunity context when discriminatory intent is an element of the tort and the summary judgment record shows that the discriminatory intent might have played a part in the state official's acts. Foy v. Holston, 94 F.3d 1528, 1534 (11th Cir. 1996).  Mt. Healthy in the qualified immunity context "raises the possibility that even conduct which might ultimately be found to be unlawful was objectively reasonable when it was done." Id.   In Foy v. Holston, the Eleventh Circuit stated that qualified immunity is not ruled out  "wherever discriminatory intent appears in the summary judgment record even if discriminatory intent is an element of the underlying constitutional tort."  Foy v. Holston, 94 F.3d 1528, 1533 (11th Cir. 1996). "Unless it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct-despite his having adequate lawful reasons to support the act-was the result of his unlawful motive, the defendant is entitled to immunity." Id. at 1535.  In other words, "when an adequate legal motive is present, that a discriminatory motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage." Id. at 1534-35.  Thus, "[a] defendant is entitled to qualified immunity under the Foy rationale only where, among other things, the record indisputably establishes that the defendant in

56

fact was motivated, *at least in part*, by lawful considerations. <u>Stanley</u>, 219 F.3d at 1296. (emphasis in original).  In considering the motivations of a defendant, it is not sufficient to look to the existence of a lawful basis for termination, but, instead, the Court must determine whether a defendant was actually motivated, at least in part, by that lawful basis. <u>Id.</u> at 1296 n.29.

In <u>Stanley</u>, a police officer alleged he was terminated in retaliation for voicing a theory in 1993 that the deputy police chief had stolen money from the evidence room.  <u>Id.</u> at 1288. Four years later, in 1997, the deputy chief became acting chief of police and fired the plaintiff after the plaintiff lost his temper with coworkers, used profanity during the exchange and later lied about it. <u>Id.</u> at 1284. The <u>Stanley</u> court found that the plaintiff created jury issues on the existence of his First Amendment claim, but held that the police chief was entitled to qualified immunity on mixed motive grounds. <u>Id.</u> at 1294, 1297-98.  Of great importance to the court in <u>Stanley</u> was the fact that four years had passed since the protected speech had been expressed, the plaintiff's captain recommended his termination because of the plaintiff's deception and losing his temper, the plaintiff had been warned that further displays of temper would result in disciplinary action, including termination, and the plaintiff was terminated after the  deception and "not one, but two, incidents with co-employees." <u>Id</u>. at 1297.  Based on those facts, the <u>Stanley</u> court held that it was undisputable that the police chief was motivated, at least in part, by the plaintiff's 1997 misconduct and deception. <u>Id</u>.

Here, having created jury issues on the existence of the constitutional violation, Plaintiffs must demonstrate that the individual Defendants would have known that the adverse acts taken against Plaintiffs violated clearly established law.  The Eleventh Circuit has held that a public employer cannot retaliate against an employee for speech related to union organization.  <u>Cook v.</u>

Gwinnett County School Dist., 414 F.3d 1313, 1319 (11th Cir. 2005); see also Porter v. Califano, 592 F.2d 770, 779 (5th Cir. 1979)[36] (speech regarding termination of top union leader was matter of public concern). Similarly, the law is clearly established that public employees have the right to freely associate without retaliation. Cook, 414 F.3d at 1320 (associational activities such as discussing union activities and recruiting other union members in a non-disruptive manner are protected by the First Amendment); see also Thomas v. Collins, 323 U.S. 516 (1945) (freedom of association protection extends to membership in labor unions). Thus, the remaining issue for this Court's consideration is the application of Foy and its mixed-motive analysis.

Viewing the facts in the light most favorable to Plaintiffs, the Court finds that the record evidence does not indisputably demonstrate that the individual Defendants were in fact motivated, at least in part, by objectively lawful considerations. Stanley, 219 F.3d at 1296. Here, the record is replete with comments from which a jury could conclude that the individual Defendants were only motivated by illegal considerations. By way of example only, Harris told Poole that the people involved in the FLSA lawsuit would be marched out of the courtrooms in handcuffs for lying in depositions. (Gordon Dep. 48-49; Johnson Dep. 37-38; Poole Decl. ¶ 6.) At another meeting, Harris called the plaintiffs in the FLSA lawsuit "cowards." (Gordon Dep. 62; Reed Dep. 252-57; Diaz Decl. ¶ 16.) Pudney stated that he would fight the "SOBs" who brought the FLSA suit. (Del Rosario Decl. ¶ 24.) Harris referred to union employees as "children" who he put on the

---

[36] The decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit. Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

"leper shift."[37] (Reed Dep. 28-29.)  Gordon told Del Rosario that he was sick of her, that she had

sued him, and she was ruining the department. (Del Rosario Dep. 32; Gordon Dep. 82.)  Later

when Gordon gave Del Rosario a failing evaluation, he told her that she failed because of her

involvement in the union and the overtime lawsuit. (Del Rosario Dep. 14; Del Rosario Decl. ¶ 10.)

At another point, Gordon screamed at Poole and Diaz for bringing the overtime lawsuit and

starting the union and told them that they were ruining the department because of their

participation in the overtime lawsuit and union-organizing efforts.  (Gordon Dep. 110-11; Diaz

Decl. ¶ 12.)  Lastly, Harris and Gordon unsuccessfully sought to bring criminal charges against

several Plaintiffs for sending a letter regarding unionization.  (Diaz Decl. ¶ 7; Neri Decl. ¶ 7; Poole

Decl. ¶¶ 9-10; State Attorney's Memo, Pl. Ex. K.)

        This case can best be compared to <u>Bogle v. McClure</u>, 332 F.3d 1347 (11th Cir. 2003).  In

that case, several white librarians brought a section 1983 race discrimination action against

members of the board of trustees for the public library system and director of the system.  The

white librarians alleged that they were transferred from their jobs at the central library to "dead-

end" jobs at branch libraries. <u>Id.</u> at 1350.  The evidence in that case included the hiring of a new

director who began planning a system-wide organization, which involved providing branch

libraries with additional professional librarians.  <u>Id.</u> At the same time, the library board took issue

with the low number of African-American managers at the central library and there was evidence

that one board member suggested moving people out of the Central library and bringing some

African-American librarians into the Central library. <u>Id.</u>  at 1350-51.  In addition, the new director

---

        [37] There is also record evidence that Harris made obscene gestures after a meeting about
union membership. (Diaz Dep. 62.)

noted that the branch libraries were understaffed and the Central library was overstaffed and recommended transferring Central library employees to branch libraries.  Id. at 1351.   The Court stated that the librarians' evidence suggested that "the reorganization plan was a sham to cover up the race-based transfers" and that a "reasonable jury had reason to doubt [the] asserted nondiscriminatory reason for the transfers."  Furthermore, the Court also stated that "[v]iewing the facts in the light most favorable to the Librarians, the record evidence does not undisputably indicate that the [board and director] were in fact motivated, in part, by objectively valid reasons." Id. at 1356.

While the Court recognizes that the individual Defendants provide record evidence of lawful reasons for some of their actions, the Court concludes that, in view of the record evidence supporting Plaintiffs' assertions, it is not indisputable that Defendants were truly motivated, in part, by the lawful reasons.  It is the province of a jury to decide that question.  In the face of Plaintiffs' evidence related to the union drive, and in conjunction with taking all the evidence in the light most favorable to Plaintiffs, the individual Defendants are not entitled to qualified immunity.

### REMAINING MOTIONS

1.   Harris' Supplemental Motion for Summary Judgment (DE 150); Plaintiffs' Motion to Strike Harris' "Supplemental Motion for Summary Judgment and Incorporation Memorandum of Law"(DE 156); Harris' Corrected Supplemental Motion for Summary Judgment (DE 229)

On November 1, 2006, Defendants moved for a 60-day enlargement of time of the discovery and dispositive motion deadlines.  The Court denied this request, and the dispositive motion deadline was therefore December 15, 2006. (DE 49.)   On December 15, 2006, Defendants City of Plantation, Pudney, and Gordon filed motions for summary judgment and Harris filed a

motion to adopt the motions of his co-defendants.  On December 22, 2006, without seeking leave

of the Court, Harris filed a Supplemental Motion for Summary Judgment.  Plaintiffs have moved to

strike this supplemental motion.  Given that Harris' motion is untimely, and the Court previously

denied Defendants' motion for an extension, the Court will grant Plaintiffs' motion to strike.

Given that Harris also filed a Corrected Supplemental Motion for Summary Judgment in response

to a Court order to the parties to make corrections to their summary judgment submissions, the

supplemental motion is also stricken.

     2.     <u>Gordon's Notice of Objection and/or Motion to Strike (DE 201)</u>

     Gordon moves to strike portions of the affidavits filed by Poole and Terheun.  With respect

to Poole, Gordon claims that a portion of the affidavit testimony contradicts prior deposition

testimony.  With respect to Terheun, Gordon asserts that a portion of the affidavit testimony

contains a statement not within Terheun's personal knowledge or is hearsay.

     To strike portions of Poole's affidavit, Gordon must show that Poole's affidavit is "sham."

"When a party has given clear answers to unambiguous questions which negate the existence of

any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit

that merely contradicts, without explanation, previously given clear testimony."  <u>Van T. Junkins</u>

<u>and Associates, Inc. v. U.S. Industries, Inc.</u>, 736 F.2d 656, 658 (11th Cir. 1984).  After examining

the portions of the affidavit, as well as the deposition testimony highlighted by Gordon, the Court

has determined that the affidavit is not a sham and there is no basis to strike any portions of it.

Specifically, the Court finds that there are no inconsistencies between the statements in the

affidavit and the deposition.

     The Court does find, however, that the statement attributed by Lieutenant Alanez to Gordon

is hearsay, and is not based on Terheun's first-hand knowledge. For that reason, the statement is stricken.

> 3.   City of Plantation and Pudney's Motion to Strike Declaration of Thomas Tofexis (DE 232) and Defendant Joseph R. Harris' Motion to Adopt Co-Defendants' City of Plantation and Robert S. Pudney, Motion to Strike Declaration of Thomas Tofexis (DE 234)

On September 12, 2007, Plaintiffs filed Notice of Filing Supplement to the Record and attached the Declaration of Thomas Tofexis, an individual who was a plaintiff in the underlying FLSA lawsuit. The City of Plantation and Pudney have filed an opposition to this supplementation of the record, stating that Plaintiffs have violated Rule 26.[38] The Court will grant the motion to strike. Plaintiffs have violated Rule 26 by failing to identify Mr. Toefexis in a timely manner. Even more significant, Mr. Toefexis' declaration is not relevant to the instant case. His testimony has no bearing on Plaintiffs' claims for retaliation. For these reasons, the Court grants the motion to strike the declaration.

> 4.   Plaintiffs' Motion for Leave to Amend Complaint (DE 240) and Harris' Motion to Adopt Co-Defendants City of Plantation and Joel Gordon's Responses in Opposition to Plaintiffs' Motion for Leave to Amend Complaint (DE 243)

Plaintiffs move to amend the Complaint to include the new allegation that "Diaz has been fired by the defendants in continued retaliation for his protected activity." (DE 240 at 1.) Defendants oppose this request, stating that Plaintiffs waited more than six months since Diaz's termination to request leave to amend and it would be prejudicial to inject new issues into the

---

[38] The Court grants Harris' Motion to Adopt the City and Pudney's Motion to Strike the Declaration of Tofexis

case.[39]

Rule 15(d) of the Federal Rules of Civil Procedure provides "[o]n motion and reasonable

notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any

transaction, occurrence, or event that happened after the date of the pleading to be supplemented."

"A supplemental pleading is an appropriate vehicle by which to 'set forth new facts in order to

update the earlier pleading . . .'" Lussier v. Dugger, 904 F.2d 661, 670 (11th Cir.1990) quoting 6A

C. Wright, A. Miller & M.K. Kane, Federal Practice and Procedure § 1504, at 177.  Rule 15(a)

provides that "leave [to amend] shall be freely given when justice so requires."

In resolving this motion, however, the Court must also examine Rule 16.  Under Rule 16,

district courts are required to "enter a scheduling order that limits the time to . . . join other parties

and to amend the pleadings . . ." Id.  The scheduling order "control[s] the subsequent course of the

action" unless modified by the court.  Fed. R. Civ. P. 16(e).   A scheduling order may be modified

only upon a showing of good cause.  See United National Insurance Co. v. Owl's Nest of

Pensacola Beach, Inc., No. 3:05CV374MCRMD, 2006 WL 1653380, *2 (11th Cir. June 8, 2006);

Sosa v. Airprint Systems, Inc., 133 F.3d 1417, 1418 (11th Cir. 1998).  Good cause exists when

evidence supporting the proposed amendment would not have been discovered in the exercise of

reasonable diligence until after the amendment deadline had passed.  See Forstmann v. Culp, 114

F.R.D. 83, 85-86 (M.D.N.C. 1987).

It has been held that a Court's evaluation of good cause is more stringent than its inquiry

into the propriety of amendment under the more liberal Rule 15.  See Sosa, 133 F.3d at 1418; see

---

[39] The Court grants Harris' Motion to Adopt Co-Defendants City of Plantation and Joel
Gordon's Responses in Opposition to Plaintiffs' Motion for Leave to Amend Complaint.

also Forstmann, 114 F.R.D. at 85.  Thus, even if Plaintiffs could demonstrate that the amendment

is proper under Rule 15, the Court must first determine whether Plaintiffs have shown good cause

under Rule 16(b) because Plaintiffs' Motion was filed after the scheduling order's deadline.  See

Sosa,133 F.3d at 1419.

The Court finds that Plaintiffs have demonstrated good cause to supplement the Complaint.

Having found that Plaintiffs have shown good cause, the Court also finds that Plaintiffs have met

the more liberal standard for amendment under Rule 15 as well. Foman v. Davis, 371 U.S. 178,

182 (1962) (granting amendment when there is no finding of undue delay, bad faith, dilatory

motive, undue prejudice or futility of amendment).[40]  Lastly, the Court concludes, in its discretion,

that it would not serve judicial efficiency for Diaz to file a separate lawsuit based on the allegation

of his termination.

### CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1)  Defendants City of Plantation and Robert S. Pudney's Motion for Summary Judgment

(DE 50) is **GRANTED IN PART, DENIED IN PART AND RESERVED IN PART**.

2)  Defendant Joseph R. Harris' Motion to Adopt Co-Defendants, City of Plantation and

Robert S. Pudney's Motion for Summary Judgment (DE 141) is **GRANTED IN PART, DENIED**

**IN PART AND RESERVED IN PART**.  The motion to adopt is granted.  The motion for

summary judgment is denied in part and reserved in part.  The alternative relief for an extension of

---

[40] The Court notes that the scheduling order deadline might not apply to a  supplemental
pleading as opposed to an amended pleading, which would eliminate the need to make a finding
of "good cause."  See Cabrera v. Courtesy Auto Inc., 192 F. Supp. 2d 1012, 1018 (D. Neb. 2002).
 Given that Plaintiffs have met the good cause standard, however, the Court need not resolve this
issue.

time to file a motion for summary judgment is denied.

3) Defendant Joel Gordon's Motion for Summary Judgment (DE 142) is **DENIED IN PART AND RESERVED IN PART.**

4)  Defendant Joseph R. Harris' Supplemental Motion for Summary Judgment (DE 150) is **STRICKEN.**

5)  Plaintiffs' Motion to Strike Defendant Harris' "Supplemental Motion for Summary Judgment and Incorporation Memorandum of Law" (DE 156) is **GRANTED.**

6)  Defendant Joel Gordon's Notice of Objection and/or Motion to Strike (DE 201) is **GRANTED IN PART AND DENIED IN PART**.

7)  Defendant Joseph R. Harris' Motion to Adopt Co-Defendants, City of Plantation and Robert S. Pudney Corrected Concise Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment; Or, in the Alternative, Motion for Enlargement of Time to File a Separate Concise Statement of Undisputed Facts in Support of Harris' Motion For Summary Judgment (DE 228) is **GRANTED**.

8)  Defendant Joseph R. Harris' Corrected Supplemental Motion for Summary Judgment (DE 229) is **STRICKEN.**

9)  Defendants City of Plantation and Robert S. Pudney's Motion to Strike Declaration of Thomas Tofexis (DE 232) is **GRANTED**.

10)  Defendant Joseph R. Harris' Motion to Adopt Co-Defendants' City of Plantation and Robert S. Pudney, Motion to Strike Declaration of Thomas Tofexis (DE 234) is **GRANTED.**

11)  Plaintiffs' Motion for Leave to Amend Complaint (DE 240) is **GRANTED.**

12)   Defendant Joseph R. Harris' Motion to Adopt Co-Defendants City of Plantation and

Joel Gordon's Responses in Opposition to Plaintiffs' Motion for Leave to Amend Complaint (DE 243) is **GRANTED**.[41]

      **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 5th day of May, 2010.

_____
KENNETH A.  MARRA
United States District Judge

---

[41] Defendants' Corrected Concise Statement of Undisputed Material Facts (DE 223) has been incorrectly docketed as a motion.  The Clerk is directed to terminate this for statistical purposes.