UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-61698-CIV-MARRA/JOHNSON

JEFFREY POOLE et al.,

Plaintiffs,

vs.

CITY OF PLANTATION, FLORIDA,
et al.,

Defendants.
_____/

**OPINION AND ORDER**[1]

This cause is before the Court upon Defendants City of Plantation and Robert S. Pudney's Motion for Summary Judgment (DE 50); Defendant Joseph R. Harris' Motion for Summary Judgment (DE 141) and Defendant Joel Gordon's Motion for Summary Judgment (DE 142). On May 5, 2010, the Court reserved in part on these motions (DE 253). After careful consideration, and being fully advised in the premises, the Court now issues the remainder of its ruling.

III. Discussion[2]

A. Retaliation Claims

2. Neri

Defendants concede for the purpose of the summary judgment that Neri's termination subjected him to an adverse employment action. Defendants argue, however, that Neri cannot establish any nexus between Pudney's decision to terminate him and his participation in union

---

[1] The Court presumes familiarity with its prior Orders.

[2] This ruling is a continuation of the Court's May 5, 2010 Order. Therefore, the Court proceeds under section III of its prior Order.

activities or an overtime lawsuit. (DE 52 at 20.)  In addition, Defendants argue that even if Neri could establish a prima facie case of retaliation, Defendants would have taken the same actions absent Neri's involvement with the union or the FLSA lawsuit because he "disobeyed lawful orders given by supervisors with full understanding of the orders" and "violated multiple departmental policies." (DE 52 at 23.)

The Court finds that Neri has provided adequate record evidence to defeat summary judgment on the basis of causation.  With respect to temporal proximity, prior to August of 2004, Neri had received positive evaluations.  In August of 2004, Harris approached Neri to ask him if he had heard any pro-union news in the department.  When Neri made a positive comment about the union, Harris glared at Neri and shortly thereafter, Neri received a failing evaluation. Neri also received negative evaluations in late 2004 and 2005.  Plaintiffs filed the Florida Public Employee Relations Commission ("PERC") petition in March of 2005 and the union issued a letter that same month addressing the effect of unionization on the Fire Department.  On May 9, 2005, Plaintiffs filed the FLSA lawsuit.  In May of 2005, Neri was brought to a police station by Harris and Gordon to be interrogated about sending the union letter.  Pudney wrote a memorandum to file regarding Neri's poor performance on May 1, 2005.  On June 13, 2005, a pre-determination hearing was held with Pudney who terminated Neri for disobeying direct orders, insubordination and for failure to meet the minimum performance standards. The short time gaps between these events is sufficient evidence for a reasonable jury to conclude that protected speech was a substantial factor in the decision to terminate Neri. <u>Beckwith v. City of Daytona Beach Shores, Fla.</u>, 58 F.3d 1554, 1566-67 (11th Cir.1995) (no per se rule as to length of time necessary to create inference, but five month gap between speech and initial discipline

and twelve month gap between speech and start of termination process creates factual question for jury).

Furthermore, given Harris' involvement in the investigation of Neri, and Pudney's decision to terminate Neri, their comments regarding unionization and the FLSA lawsuit are probative.  For example, Harris stated that the FLSA suit was frivolous and that the people involved in that suit would be marched out of the courtrooms in handcuffs for lying in depositions. (Gordon Dep. 48-49; Johnson Dep. 37-38; Poole Decl. ¶ 6.)  At another meeting, Harris called the plaintiffs in the FLSA lawsuit "cowards." (Gordon Dep. 62; Reed Dep. 252-57.) Pudney stated that he would fight the "SOBs" who brought the FLSA suit. (Del Rosario Decl. ¶ 24.) Harris referred to union employees as "children" who he put on the "leper shift." (Reed Dep. 28-29.) A jury could find that these comments reflect hostility to Neri's pro-union speech and the FLSA lawsuit.

Given the close temporal proximity, as well as these highlighted comments by Harris and Pudney, there is adequate evidence for the jury to find that Neri's union activity and the filing of the FLSA lawsuit was a substantial or motivating factor for his termination.

Turning to the fourth prong, Defendants argue that Neri would have been terminated absent his involvement in the union or the FLSA lawsuit.  In support, Defendants point to Neri's disregard of Battalion Chief Johnson's order to enter immediately his reports into the computer system upon his return to the station, and not wait until the morning.  Defendants also point to Neri's violation of an order to cease crew chief training of Devon Anderson, an order given to allow Neri to concentrate on his own alleged performance deficiencies.

In examining Defendants' evidence under the Mt. Healthy doctrine, the Court must apply

3

a "case by case," "fact intensive approach." Stanley v. City of Dalton, 219 F.3d 1280, 1291 and n.20 (11th Cir.2000) citing Mt. Healthy City School Dist. Bd. of Education v. Doyle, 429 U.S. 274 (1977).  Applying this doctrine in Stanley, the Eleventh Circuit found a factual question when a police officer was terminated in part for polygraph results showing deception. Although deceptive polygraph results could, standing alone, support termination, the Stanley Court found that the deceptive answers concerned less significant topics, such as the plaintiff's use of profanity as opposed to criminal activity, that did not require a finding, as a matter of law, that termination was required. Id. at 1294. Based on Stanley, this Court finds that a jury question exists.  Here, Defendants have produced no evidence that the violation of these two policies must result in termination as opposed to other forms of discipline. The Court finds a genuine issue of material fact exists as to whether Neri's violation of these orders, and not his protected speech, was the motivating factor behind his termination.

    3. Terheun

Defendants concede for the purpose of summary judgment that Terheun's suspension subjected her to an adverse employment action.  Defendants contend, however, that the record conclusively demonstrates that no nexus exists between Terheun's suspension and her involvement with the union and the FLSA lawsuit.  Defendants also contend that they would have taken the same actions regardless of her participation in the union or the lawsuit.  In making that argument, Defendants claim that Terheun slept through a response call, routed a rescue truck to the wrong address, falsified an official record and used her Nextel phone instead of the radio to speak to dispatch during a response call.   In fact, Defendants state that Terheun's suspension is a "very minor form of discipline." (DE 52 at 21, 23.)

In response, Terheun asserts that while other employees have used Nextel phones during operational calls, no one, other than Terheun, has been investigated or disciplined for it. Furthermore, with respect to the contention that she slept through a response call and therefore responded to the call late, Terheun points out that some lieutenants have entirely missed calls and have not been investigated or disciplined. Lastly, Terheun points to her interactions with Gordon and Harris as evidence of their animus to the union.

Considering the record evidence in its entirety, the Court finds that there is a genuine issue of material fact on the issue of causation. Regarding temporal proximity, the Court notes that the incident giving rise to the suspension occurred on April 18, 2005, which was approximately a month after Plaintiffs filed the PERC petition. See Beckwith, 58 F.3d at 1566-67. Furthermore, the investigation by Gordon and Harris into Terheun's actions with respect to the April 18, 2005 call provide additional evidence for a jury's consideration with respect to the substantial or motivating factor for her suspension. For example, at one point during the investigation, Terheun requested union representation, which Gordon angrily denied. Harris told Terheun she was going to get "the whole enchilada," and when Terheun again requested union representation, Harris became angry and said, "You will answer everything I ask you . . . . By saying that you are a union [sic] and entitled to that [representation], that is a violation because you're not [sic] . . . . So don't be spreading rumors out there." Furthermore, Harris told her that her requests for union representation were in violation of "PERC law" and added that "you know how the City feels about the union." Gordon and Harris subsequently recommended to Pudney that he suspend Terheun. See Fikes v. City of Daphne, 79 F.3d 1079, 1084 (11th Cir .1996) (the police chief's statement that he wanted the plaintiff out of the department is relevant in

5

determining whether the discharge was related to protected speech); Stewart v. Baldwin County Bd. of Educ., 908 F.2d 1499, 1507 (11th Cir. 1990) (same).  The close temporal proximity in conjunction with these highlighted comments provide adequate evidence for a jury to find that Terheun's union activity and the filing of the lawsuit was a substantial or motivating factor for her suspension.

Next, Defendants argue that Terheun would have suspended regardless, claiming that she committed a number of violations of protocol arising from the April 18, 2005 incident. Defendants assert that Terheun failed to respond to an alarm to go to a home because she was asleep.[1]  Once Terheun became aware of the need to respond to the call, she initially routed the fire-rescue truck to the wrong address, eventually arriving 22 minutes after the call was received, as opposed to the average of six minutes it generally takes to respond to calls.  She then falsified the official report relating to the call, and improperly used her Nextel phone to communicate with dispatch during the call.  Moreover, Defendants assert that the discipline she received was "minor." (DE 52 at 21, 23.)

In response, Terheun asserts that her alleged malfeasance is both explainable and excusable, and that Defendants are improperly drawing negative inferences about these events to justify their retaliatory conduct.  Terheun claims that the delay in reaching the correct address was excusable, given the evidence that due to a language barrier between the dispatcher and the person placing the call, the dispatcher also had trouble learning the correct name of the residential development.  Regarding the alleged falsification of the report, Terheun points to

---

[1] At the time in question, Terheun was a Lieutenant Para-medic.  The call in question was received at approximately 3:45 a.m.

record evidence that she called dispatch to verify the correct time to include in the report, and she relied upon the information given to her. She also argues that with respect to her delayed response to the call, others have missed calls entirely, a more serious error than getting to a call late, and they have not been investigated or disciplined. Regarding the alleged improper use of the Nextel phone, Terheun points to record evidence demonstrating that other employees have used the Nextel phones during operational calls, but they have not been investigated or disciplined. The Court notes that there is no record evidence that other employees have been disciplined for violating the telephone protocol.

In view of the conflicting inferences that can be drawn from the evidence arising from this incident, and taken in consideration with the evidence relied upon by Terheun to show anti-union animus, the Court finds that genuine issues of material fact exist as to whether the discipline imposed upon Terheun was actually attributable to the April 18, 2005 incident, or was nothing more than a subterfuge which Defendants used as an excuse to retaliate against Terheun for protected speech. For these reasons, Defendants' motion for summary judgment is denied.

4. Diaz

With respect to Diaz, Defendants claim he was not subjected to any adverse employment action. As evidence of adverse employment actions, however, Diaz points to the following evidence: (1) he was subjected to a frivolous criminal investigation; (2) he was transferred to different shifts three times in 20 months; (3) the denial of permission to swap shifts and work overtime; (4) physical threats from Gordon; (5) isolation from co-workers (6) insulting and demeaning physical gestures from Harris in front of other co-workers and (7) financial harm in the amount of $1,800.00 due to the need to reschedule a cruise after his request for vacation was

denied.

The Court likens these employment actions, which must be viewed in the light most favorable to Diaz on a motion for summary judgment, to the facts present in Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453 (11th Cir. 1998). In Wideman, the Court examined the evidence required to establish a prima facie case of retaliation and thereby satisfying the adverse employment action requirement. Id. at 1456. The Wideman plaintiff alleged she was incorrectly listed as a "no-show" on a day she was scheduled to have off, and was then ordered to work on that day without a lunch break; she was given a one-day suspension; her employer solicited co-workers for negative comments about the plaintiff; she was physically threatened by the assistant manager, and necessary medical treatment was needlessly delayed. Id. at 1455. The Wideman Court held that these actions could be considered collectively in determining the adverse employment action requirement. Id. at 1456; see also Berry v. Stevinson Chevrolet, 74 F.3d 980, 986 (10th Cir. 1996) (finding actionable retaliation where employer filed false criminal charges against former employee who complained about discrimination).[2]

The Court also rejects Defendants' argument that the three transfers can not constitute an adverse action. First, taking the facts in the light most favorable to Diaz, these transfers were part of a collective and orchestrated campaign to retaliate against him. The first transfer resulted in the disruption of his vacation plans and required him to pay an addition $1800.00 to

---

[2] The Court rejects Defendants' argument that Diaz must present evidence that Defendants' belief that he committed a crime was not worthy of credence. (DE 204 at 5.) The cases relied upon by Defendants in support of this proposition concern a plaintiff's burden at the pretext stage, not at the stage of a prima facie case. In any event, in discussing adverse employment acts, the United States Supreme Court favorably relies upon Berry in its Burlington decision. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006).

reschedule his cruise. The second transfer resulted in Diaz's placement to an "anti-union shift" where he was told by his supervisor that he was hated, his co-workers refused to talk to him and his new lieutenant told him they were no longer friends. In setting forth the retaliation standard, the United States Supreme Court noted that "any given act of retaliation will often depend upon the particular circumstances. Context matters." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69 (2006). Here, the Court would be remiss not to consider the context in which Diaz found himself after the second transfer. Indeed, even Harris characterized that shift to Diaz as the "anti-union" shift, suggesting that Diaz was placed on that shift for retaliatory reasons. (Diaz Decl. ¶¶ 17-18.) Cf. Taylor v. Roche, 196 Fed. Appx. 799, 803 (11th Cir. 2005) (repeated refusal to transfer employee is adverse employment action when employee experienced tense work environment with a particular supervisor and where employee sought transfer to avoid a tense environment and be able to take children to school);

Finally, in light of the physical threats from Gordon and the demeaning physical gestures made by Harris to Diaz in front of other co-workers, taken in conjunction with the other record evidence highlighted herein, the Court finds that Defendants' motion for summary judgment on the basis that Diaz has not established an adverse employment action must be denied.

With respect to causation, Defendants' argument on this point is brief. They assert that Diaz cannot establish that his involvement in the union and the FLSA lawsuit substantially motivated Defendants to take adverse actions against him.[3] In terms of showing that they would

---

[3] Defendants also argue that because Diaz never complained to Pudney about any of the actions taken against him, he cannot establish causation. (DE 52 at 18.) While Defendants do not provide any caselaw or further explanation, this argument appears to relate not to causation but to the issue of municipal liability and therefore was addressed in section III(b) of the Court's May 5, 2010 Order.

have taken the same action against Diaz regardless, Defendants state that Diaz was involved in delayed response calls, his excessive absences permitted the denial of annual leave and overtime requests, and he never received any discipline, just recommendations of discipline. (DE 52 at 22.)

In response, Diaz points to a meeting between him and Harris in May 2006 wherein Harris asked Diaz about the lawsuit and union membership.  Diaz refused to answer Harris and Harris told Diaz that union supporters were cowards.  After that meeting, Harris saw Diaz in the parking lot, bent down, and made an obscene gesture with his buttocks.  In January of 2006, Gordon told Diaz not to address him. However, on February 23, 2006, Gordon approached Diaz, clenched his fists and screamed at Diaz to take a shot at him.  On May 23, 2005, Harris and Gordon brought Diaz to the police station to be questioned by a detective and Harris told him that he would be prosecuted for perjury and that the overtime lawsuit was a personal attack.

Significantly, there is no dispute that the adverse employment acts highlighted herein all occurred during the 2005 union drive and the pendency of the lawsuit.  Moreover, the incendiary interactions between Harris, Gordon and Diaz certainly creates a question of fact for a jury to consider in determining whether the adverse actions were taken against Diaz for his participation in the union or the FLSA lawsuit.  Likewise, the Court cannot grant summary judgment for Defendants as a matter of law on the Mt. Healthy prong either.  Although Defendants contend that they would have taken the same action against Diaz regardless of his involvement with the union or the lawsuit, that argument hardly passes muster given the record evidence that Defendants made Diaz the subject of a frivolous criminal investigation, physically threatened him, isolated him from co-workers and subjected him to insulting and demeaning physical

gestures from Harris in front of other co-workers. For these reasons, and adopting the reasoning set forth in the Court's discussion with respect to Poole, Neri and Terheun supra, the Court denies Defendants' motion for summary judgment.

### 5. Del Rosario

Defendants also claim Del Rosario was not subjected to any adverse employment actions. In opposing Defendants' motion for summary judgment on this basis, Del Rosario relies upon the following record evidence: (1) the denial of a light duty request which required her to take annual leave to recover from surgery; (2) the denial of requests to swap shifts or work overtime; (3) the requirement to wash and wax trucks that were out of service; (4) department officials informing co-workers that she is to blame for the unpleasant working conditions of her co-workers; (5) application of rules applied only to her including not allowing her husband to visit her at the station, requiring her to remain in the bunkroom during volunteer fire fighters meetings, requiring her to leave the room when Harris entered, not allowing her to communicate with Gordon or Johnson without her lieutenant present, and not permitting her to attend the memorial reception for a fallen volunteer fire fighter and (6) a verbal confrontation with Gordon wherein he told her he was sick of her, he would write her up for insubordination, that she had sued him and was ruining the department.

In analyzing this evidence, the Court notes that Burlington instructs courts to examine the alleged retaliatory behavior and decide whether the acts taken by Defendants would have been likely to deter Del Rosario from complaining to either the courts or her employer. Burlington, 548 U.S. at 68. Taking these acts collectively, the Court finds that Defendants have not met their burden at the summary judgment stage to allow the Court to conclude, as a matter of law, that the

acts taken against Del Rosario were not materially adverse.  In so finding, the Court incorporates the analysis applied supra with respect to Diaz and the application of the Wideman standard.  See Wideman v. Wal-Mart Stores, Inc., 141 F.3d at 1456; see also Shannon v. Bellsouth Telecommunications, Inc., 292 F.3d 712, 716 (11th Cir. 2002) (denial of overtime opportunities is an adverse employment action); Bass v. Board of County Commissioners, Orange County, Fla., 256 F.3d 1095, 1118 (11th Cir. 2001), abrogation on other grounds recognized by Crawford v. Carroll, 529 F.3d 961 (11th Cir. 2008) (assignment of menial tasks and denial of permission to work overtime constitutes adverse action).   The Court notes that the cases cited by Defendants in support of their motion rely on pre-Burlington decisions.  Burlington, however, "strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him [or her] and thus constitute adverse employment actions." Crawford v. Carroll, 529 F.3d at 974 n.13 citing Burlington, 548 U.S. at 71.  As such, the Court concludes that Defendants' motion for summary judgment on this basis must be denied.

With respect to causation, Defendants apply the same argument to Del Rosario as they did with Diaz; namely, that Del Rosario cannot establish her involvement in the union and the FLSA lawsuit substantially motivated the Defendants to take adverse actions against her. (DE 52 at 18.)   The only argument made by Defendants relative to their Mt. Healthy burden is that Del Rosario was placed on a thirty-day re-evaluation period during which she was ineligible to take annual leave, overtime or swap shifts. (DE 52 at 22.)

In response, Del Rosario provides evidence regarding her treatment by Harris and Gordon. For example, Harris and Gordon said that an employee had claimed that Del Rosario

New Year's Resolution was to "screw the department" and Gordon looked in Del Rosario's direction when he stated that "this person" wanted to "f— the department." When she requested light duty, Harris asked her, "Do you really think you will get light duty after everything that's been going on here and with this lawsuit?"  Moreover, Harris issued an order that Del Rosario should leave the room when he entered.  Gordon gave Del Rosario a failing evaluation and told her that she failed because of her involvement in the union and the overtime lawsuit.   He also yelled at her, told her that she sued him, was ruining the department and would write her up if he heard her name one more time.

      Based on this record evidence, the Court applies a similar analysis to Del Rosario as it did to Diaz.  The employment acts highlighted herein all occurred during the 2005 union drive and the pendency of the FLSA lawsuit.  Moreover, the hostility towards Del Rosario certainly raises a question of fact for a jury as to whether the adverse actions were taken against Del Rosario for her participation in the union or FLSA lawsuit.  Likewise, the Court cannot grant summary judgment for Defendants as a matter of law on the Mt. Healthy prong either.  Although Defendants contend that they would have taken the same action against Del Rosario regardless of her involvement with the union or the lawsuit, that contention is suspect given the record evidence that Defendants' selectively applied punitive policies against her only (e.g., not allowing her husband to visit her at the station unlike her co-workers' spouses, requiring her to remain in the bunkroom during volunteer fire fighters meetings, requiring her to leave the room when Harris entered, not allowing her to communicate with Gordon or Johnson without her lieutenant present and being ordered not to attend the memorial reception for a fallen volunteer fire fighter).  For these reasons, and adopting the reasoning set forth in the Court's discussion

with respect to Poole, Neri and Terheun supra, the Court denies Defendants' motion for summary judgment on causation as well as on adverse employment action.

### 6. Kluver and Tribie

Defendants move for summary judgment against Kluver and Tribie, claiming they were not subjected to an adverse employment action in the form of a constructive discharge.

According to Kluver, she was subjected to a "harassing investigation and intrusion into her secondary employment by both Gordon and Harris, and was constructively discharged by their disciplinary investigation and harassment." (Resp. at 18.)  Defendants contend that when Kluver learned that Harris had recommended her termination, Kluver decided to submit her resignation instead of meeting with Pudney, as scheduled, to discuss the charges.  Defendants also point to record evidence that she resigned due, in part, to her father's terminal condition and her belief that, if she returned to work, it would not be on good terms.  (DE 52 at 11.)

Similarly, Tribie contends he was "the subject of an intrusive investigation into his personal finances by Chief Harris, who also threatened a continued investigation if he did not resign." (Resp. at 18.)   Defendants state that Tribie resigned immediately after Harris informed him that he could not have a second job until it was approved, and that Tribie never spoke with Pudney or any other City official about the fact that he thought Harris was forcing him to resign his position with the City. (DE 52 at 9.)

"Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." Bryant v. Jones, 575 F.3d 1281 (11th Cir. 2009) quoting Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 244 (4th Cir. 1997).  A plaintiff must show "working conditions that are 'so intolerable that a reasonable

person in [the employee's] position would have been compelled to resign.'" Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 977 (11th Cir. 2003) quoting Poole v Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997); see Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993); Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1317 (11th Cir. 1989). "Part of an employee's obligation to be reasonable is an obligation not to assume the worse, and not to jump to conclusions too fast." Beltrami v .Special Counsel, Inc., 170 Fed. Appx. 61, 62 (11th Cir. 2006) quoting Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th 1987). The threshold for demonstrating a constructing discharge is "quite high." Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001). "A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation." Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir.1996) (affirming summary judgment where the employer began an investigation of the plaintiffs' complaint on a Friday and attempted to meet with the plaintiffs on the following Tuesday, and where the plaintiffs did not return to work after advising the employer of their complaints). The constructive discharge issue does not present a jury question unless a plaintiff presents substantial evidence that the conditions were intolerable. Brochu v. City of Rivera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002).

After careful review of the entire record evidence, and the controlling Eleventh Circuit law, the Court finds that Kluver and Tribie have not met the high standard for constructive discharge. See Bryant, 575 F.3d at 1299 (constructive discharge established when evidence included an interaction wherein supervisor appeared ready to assault employee); Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 552 (11th Cir.1997) (holding that summary judgment for defendants was inappropriate where plaintiff was relieved of all responsibilities

and was given a chair with no desk, and other employees were instructed not to speak to her); Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1015 (11th Cir.1994) (holding court's finding of constructive discharge was supported by evidence of the plaintiff being placed on probation, receiving unjustified work evaluations, and being repeatedly screamed at so that supervisor's "spit was flying in [the plaintiff's] face").

Here, the Court concludes, as a matter of law, that the working conditions for Kluver and Tribie were not so intolerable as to justify their voluntary resignation. Moreover, Kluver resigned before meeting with Pudney to discuss the charges and recommendation of termination against her. See Rowell v. BellSouth Corp., 433 F.3d 794, 806 (11th Cir.2005) ("The fact that one of the possible outcomes is that he would lose his job alone is not sufficient to establish the intolerable conditions sufficient to justify a finding of constructive discharge...."). Likewise, Tribie decided to resign because he needed the income from his secondary employment. Furthermore, he never spoke with Pudney or any other City official about the fact that he thought Harris was forcing him to resign his position with the City. Mitchell v. Pope, 189 Fed. Appx. 911, 914 (11th Cir. 2006) (although the plaintiff believed the Sheriff defendant would not be receptive to her complaint about her supervisor, the plaintiff did not give the Sheriff an opportunity to remedy the situation); see Kilgore, 93 F.3d at 754.

For these reasons, Kluver and Tribie cannot establish a prima facie case of retaliation and Defendants' motion for summary judgment is granted.

## **CONCLUSION**

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1) Defendants City of Plantation and Robert S. Pudney's Motion for Summary Judgment

(DE 50); Defendant Joseph R. Harris' Motion for Summary Judgment (DE 141) and Defendant Joel Gordon's Motion for Summary Judgment (DE 142) are **GRANTED IN PART AND DENIED IN PART.**

2) The Court will separately issue a final judgment with respect to Plaintiffs Kluver and Tribie.

3) In light of the pending appeals before the United States Court of Appeals for the Eleventh Circuit, the Court hereby requests that the parties submit a joint status report, **within 15 days from the date of entry of this Order**, advising the Court as to how they believe this case should proceed

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 14th day of October, 2010.

_____
KENNETH A. MARRA
United States District Judge